17-3506-pr
*Charles v. Orange County*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2018

Argued: September 25, 2018
Decided: May 24, 2019

No. 17-3506-pr

MICHELET CHARLES, CAROL SMALL,

*Plaintiffs-Appellants,*

— v. —

ORANGE COUNTY, STATE OF NEW YORK, ORANGE COUNTY SHERIFF'S DEPARTMENT, ORANGE COUNTY DEPARTMENT OF MENTAL HEALTH, CARMEN ELIZONDO, FORMER CLINIC DIRECTOR, ORANGE COUNTY CORRECTIONAL FACILITY, in her individual capacity,

*Defendants-Appellees,*

NICOLE KAYE, CLINIC DIRECTOR, ORANGE COUNTY CORRECTIONAL FACILITY, in her individual capacity,

*Defendant.*

Before:

LYNCH and HALL, *Circuit Judges*, and BOLDEN, *District Judge*.[*]

Plaintiffs-Appellants Michelet Charles and Carol Small were formerly civil immigration detainees at the Orange County Correctional Facility, where they were treated for serious mental illnesses. They instituted this civil rights action against Orange County and some of its agencies and officials under 42 U.S.C. § 1983, complaining that the failure to engage in discharge planning or to provide them with discharge plans upon release violated their substantive due process rights under the Fourteenth Amendment. The United States District Court for the Southern District of New York (Nelson S. Román, *J.*) granted the Defendants' motion to dismiss the complaint. We VACATE and REMAND for further proceedings.

---

DANIEL J. STUJENSKE, Simpson Thacher & Bartlett LLP, New York, NY (Thomas C. Rice, Simpson Thacher & Bartlett LLP, *on the brief*), Laura F. Redman, Antony P. F. Gemmell, New York Lawyers for the Public Interest, New York, NY *for* Plaintiffs-Appellants Michelet Charles and Carol Small.

ANTHONY CARDOSO, Orange County Attorney's Office, Goshen, NY, *for* Defendants-Appellees Orange County, State of New York, Orange County Sheriff's Department, Orange County Department of Mental Health and Carmen Elizondo, Former Clinic Director, Orange County Correctional Facility, in her individual capacity.

---

[*] Judge Victor A. Bolden, of the United States District Court for the District of Connecticut, sitting by designation.

Aaron M. Panner, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC (Ira A. Burnim, Judge David C. Bazelon Center for Mental Health Law, Washington, DC, *on the brief*), for *Amici Curiae* American Psychiatric Association, American Academy of Psychiatry and the Law, American Psychological Association, American Medical Association, National Association of Social Workers, American Public Health Association, and Judge David L. Bazelon Center for Mental Health Law, in support of Plaintiffs-Appellants.

Jamie A. Levitt, Morrison & Foerster LLP, New York, NY, for *Amici Curiae* The Bronx Defenders, Brooklyn Defender Services, Community Initiatives for Visiting Immigrants in Confinement, Detention Watch Network, The Florida Justice Institute, Inc., Human Rights First, Immigrant Defense Project, The Immigrant Rights Clinic of Washington Square Legal Services, Inc., at NYU Law School, the Kathryn O. Greenberg Immigration Justice Clinic at the Benjamin N. Cardozo School of Law, The Legal Aid Society of New York, The Prison Law Office, Prisoners' Legal Services of New York, and the Urban Justice Center Mental Health Project, in support of Plaintiffs-Appellants.

Alexander M. Wilson, New York State Sheriffs' Association, Albany, NY for *Amicus Curiae* New York State Sheriffs' Association, in support of Defendants-Appellees.

---

GERARD E. LYNCH, *Circuit Judge*:

The question before us is whether the Plaintiffs-Appellants, Michelet Charles and Carol Small, have stated a plausible claim for relief under the Fourteenth Amendment for deliberate indifference to their serious medical needs. Plaintiffs were confined for many months as civil immigration detainees at the Orange County Correctional Facility, where they received treatment for their serious mental health disorders. Defendants-Appellees are Orange County, the municipality that oversees the Orange County Correctional Facility ("the Jail"); the Orange County Sheriff's Office, the specific entity that contracts with the Federal Government to house detainees in the Jail; the Orange County Department of Mental Health, the agency responsible for providing mental health services to people confined at the Jail; and Carmen Elizondo, the Clinical Director at the Jail.[1] Plaintiffs filed a complaint in the United States District Court for the Southern District of New York alleging that the Defendants, who were responsible for providing them with medical care while they were detained at the Jail, failed to provide them with mental health discharge planning before their

_____

[1] The parties stipulated to the dismissal of this appeal with prejudice with respect to former defendant Nicole Kaye.

4

release from custody, in violation of the Fourteenth Amendment's Due Process

Clause. Plaintiffs seek relief under 42 U.S.C. § 1983.

The district court (Nelson S. Román, *J.*) dismissed Plaintiffs' complaint for

failure to state a claim. For the reasons that follow, we VACATE that judgment,

and REMAND for further proceedings.

## BACKGROUND

Both Plaintiffs suffer from serious, ongoing mental illnesses.[2] Each Plaintiff

was arrested by agents of the U.S. Immigration and Customs Enforcement

("ICE"), the federal law enforcement agency charged with the detention and

removal of illegal immigrants. While awaiting their removal proceedings,

Plaintiffs were detained at the Jail, a county detention facility that houses civil

immigration detainees pursuant to an intergovernmental agreement between ICE

and Orange County. During their detention, Plaintiffs were treated for their

illnesses, receiving counseling and psychotropic medication. However, the

treatment Plaintiffs received while they were in custody did not include

---

[2] On this appeal from the dismissal of a complaint for failure to state a claim, we take the allegations in the complaint as true and construe them in the light most favorable to Plaintiffs. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

5

discharge planning, which Plaintiffs allege is a routine and necessary component of institutional mental health treatment. Plaintiffs claim that as a result of Defendants' failure to provide them with discharge planning while they were in custody, they suffered serious mental health consequences shortly after their release.

## I.     Michelet Charles

Plaintiff Michelet Charles is a 55-year old lawful permanent resident who has lived in the United States for 34 years. Charles has suffered from bipolar and schizoaffective disorders since around 1984. For years, he managed his illness through regular mental health care. When Charles is not treated for his illnesses, he suffers from hallucinations, delusions, and periods of mania and depression.

In July 2014, Charles was arrested by ICE officials and detained at the Jail for 363 days during the pendency of his immigration case.[3] When Charles

---

[3] ICE and Orange County confine hundreds of people in civil immigration detention at the Orange County Detention Center every year pursuant to an Inter-Governmental Services Agreement between ICE and Orange County. Civil immigration detainees are held in custody to assure their presence throughout the administrative removal proceedings. Such detainees are not charged with crimes. Nevertheless, civil immigration detainees are housed in conditions similar to those experienced by detainees awaiting trial on criminal charges.

entered the detention center, medical personnel at the facility diagnosed him with bipolar disorder with psychotic features. During his detention, Defendants provided Charles with psychiatric care, which included meeting with a psychiatrist every three weeks in order to monitor his condition, and daily psychotropic medication to keep him stable. Charles's treatment was documented by the Jail Clinic in an "Intervention/Care Plan" which listed his diagnosis, the types of counseling Charles received, the medication he required, and any suicidal or harmful tendencies he had.

On July 22, 2015, Charles was brought from the Jail to New York City for an appearance at the Immigration Court in lower Manhattan. Prior to his immigration hearing, Defendants had not provided Charles with any plan for his continued mental health care after discharge, a list of his medications, a list of outside referrals, any other information about the medication and counseling he received while detained, or assistance or information relevant to his obtaining future treatment for his known medical condition. Nor were any such materials provided to Charles at or after his hearing. Charles succeeded at his immigration hearing[4] and was released directly from the court with his identification and

---

[4] The record does not reflect the precise disposition of the matter.

nothing more. The ICE Deportation Officer who attended the hearing told Charles's attorney that ICE did not have any medication for Charles, and that he should return to the Jail if he needed to obtain a supply of his medication.

The day after his release, Charles and his daughter drove over 65 miles from their home to the Jail to obtain Charles's psychiatric medication. When Charles's daughter asked an employee at the front desk of the Jail for her father's medication, the employee refused to provide it, claiming that the person who had transported Charles to the Immigration Court was responsible for providing him with a continuing supply of medication. The Orange County employee also informed Charles and his daughter that as a matter of institutional policy, after a person is released from the facility, the Jail can no longer provide him with medication.

Charles's immigration attorney then contacted the ICE Deportation Officer again, requesting that Charles be provided with a supply of medication. The Officer did not respond to the inquiry. According to Charles's medical file from the Jail, on July 23, 2015, the day after his release, and the same day that he visited the facility with his daughter, a clinical social worker at the Jail signed a document entitled "Continuing Care Plan/Discharge Summary" ("Discharge

Summary") for Charles. The Discharge Summary listed Charles' diagnosis and expressly anticipated that Charles would have future mental health needs including medication, psychiatric treatment, and substance abuse treatment. However, neither Charles nor his attorney was given a copy of the Discharge Summary.

After his release, without immediate access to his prescription anti-psychotic and anti-depressant medications and counseling, Charles soon began psychologically decompensating. He exhibited bizarre behavior, was disorganized, and mumbled when he spoke. His family reported that he was manic, anxious, and paranoid.

By August 4, 2015, Charles was experiencing symptoms of psychosis, and his ability to control his thoughts and emotions was so impaired that he lost contact with reality. On that date, Charles's family called 911 for emergency medical assistance. The police officers who responded to the call transported him to the emergency room at a nearby hospital. The next day, Charles was hospitalized in an inpatient psychiatric unit of North Shore LIJ South Oaks Hospital. His admission record states that he had worsening aggressive, disorganized, and bizarre behavior, and was preoccupied with paranoid ideas. It

9

took two months in the hospital for Charles's condition to stabilize and for him to return to his baseline mental state.

## II.    Carol Small

Plaintiff Carol Small is a 45-year old lawful permanent resident of the United States. Before she was detained, Small lived on her own and supported herself as a hairdresser in the Bronx.

Small was detained at the Jail in May 2015. After about a month of detention, Small began experiencing symptoms of severe mental illness, including visual and auditory hallucinations. She became extremely paranoid and delusional, believing that she was being monitored by the government through a chip implanted in her tooth, that there was a government conspiracy to poison her, and that poison was coming through the vents in the Jail. In late June 2015, a psychiatrist at the Jail diagnosed Small with paranoid schizophrenia. Similarly to Charles, her diagnosis, medications, and counseling needs were documented by the Jail Clinic in a document titled "Intervention/Care Plan." But like Charles, Small was not provided with a copy of that document.

In September 2015, Small was transferred to the inpatient ward at Kings County Hospital for intensive treatment for her mental illness. In October, after

10

her condition stabilized, she was transferred back to the Jail. Upon her return, medical employees of the Orange County Department of Mental Health provided Small with medically necessary treatment and continued to prescribe and administer her daily prescription medication, which kept her stable.

On January 11, 2016, an Immigration Judge granted Small immigration relief and ordered her release.[5] Small was released from the Jail on January 19, 2016 at around 6:30 PM, in below-freezing temperatures, with $80 in cash. Small was not given an interim supply of her prescribed medicines, a list of her medications, a description of the treatment she had received while detained, or a list of outside referrals or providers for continuing care. During the roughly six months in which Small was treated for her mental illness at the Jail, she was not provided with any discharge planning.

Upon her release, Small took the train from Orange County to Penn Station. She stayed briefly with family members, and then a social worker from the organization that had provided Small with immigration representation arranged for her to live in a shelter. While Small was struggling to re-establish her life after release, she was extremely distressed and worried for her own

---

[5] Again, the record does not describe the exact nature of the disposition.

health and the possibility of relapsing without the medication she had been taking to treat her mental illness. On January 21, 2016, Small checked herself into the emergency room at North Central Bronx Hospital in an effort to obtain medication. Because Small had written down a list of the medications she was taking while detained, the hospital was able to prescribe her the same medications without a full psychological evaluation. These events were emotionally distressing for her.

### III.   Procedural History

Plaintiffs filed a complaint (the "Complaint") on July 12, 2016, asserting violations of the Fourteenth Amendment. They claim that substantive due process requires that civil detainees be afforded adequate medical care during their detention, and that their medical care should have included discharge planning, because of their serious mental illnesses. They allege that discharge planning is regarded by medical and psychological professionals as an essential part of mental health care, especially in institutional settings, where it is necessary to mitigate the risks of interrupted treatment while patients transition from treatment within the institution to other sources of treatment. Plaintiffs contend that by failing to provide them with discharge planning, Defendants

were deliberately indifferent to the risk that Plaintiffs would relapse upon release and face mental decompensation and other serious health consequences.

On January 30, 2017, Defendants moved to dismiss the entire Complaint for failure to state a claim. Defendants argued that there is no established substantive due process right to the post-release measures inherent in discharge plans. On their view, the government's duty of care ends the instant the inmate walks through the prison gates and into the civilian world, because that is when the inmate's ability to secure medication or care on his own behalf is restored.

On September 29, 2017, the district court granted Defendants' motions.[6] *See Charles v. County of Orange*, No. 16-CV-5527 (NSR), 2017 WL 4402576 (S.D.N.Y. Sept. 29, 2017). The district court construed the Complaint as stating three claims under § 1983: (1) a *Monell* claim against Orange County, the Orange County Sheriff's Department, and the Orange County Department of Mental Health (the "County Defendants") alleging a policy, practice and custom of providing constitutionally inadequate health care to persons held in civil immigration detention; (2) a claim against all Defendants for deliberate indifference to

---

[6] Defendants-Appellants filed one joint motion and former defendant Kaye filed a separate motion.

13

Plaintiffs' serious medical needs by discharging them from the Jail without adequate discharge plans; and (3) supervisory liability claims against Kaye and Elizondo (the "Individual Defendants"), successive clinic directors at the Jail, who Plaintiffs claim were responsible for providing them with medical treatment while they were detained.

The district court recognized that the Fourteenth Amendment Due Process Clause requires a correctional facility to provide medical care to detainees while they are in custody. But it understood the Complaint to claim that Defendants did not provide Plaintiffs with necessary medical treatment *after* they were released. The district court concluded that even though the Plaintiffs had adequately pled that the Defendants were deliberately indifferent to their serious medical needs, the standard they would have to meet if they alleged a constitutional violation while they were in custody, Plaintiffs' claims failed because the failure of treatment did not "shock the conscience." Since Plaintiffs' substantive Fourteenth Amendment claim failed, the district court declined to address the *Monell* claim against the County Defendants, or the supervisory liability claim against the Individual Defendants.

Because the district court construed Plaintiffs' allegations as regarding deliberate indifference to post-custody medical care, rather than deliberate indifference to needed in-custody medical care, the district court applied the wrong standard in determining whether Plaintiffs adequately pled a Fourteenth Amendment violation. We therefore vacate the district court's dismissal of the Complaint and remand for further proceedings.

## DISCUSSION

We review *de novo* a district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) and grant of a motion for judgment on the pleadings under Rule 12(c). *See Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 156–57 (2d Cir. 2017); *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 178 (2d Cir. 2013). In considering Defendants' motions, we accept as true all factual allegations in the Complaint and draw all reasonable inferences in Plaintiffs' favor. *See id.*

At this stage, we need decide only whether Plaintiffs' claims are facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it

15

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal citations and quotation marks omitted).

## I. Discharge Planning as In-Custody Care

On appeal, Plaintiffs argue that the district court misconstrued the allegations in their Complaint and therefore applied an incorrect legal analysis to their Fourteenth Amendment claims. The district court construed Plaintiffs' Complaint as contending that the Defendants owed Plaintiffs a duty to provide them with limited medical care *after* they had been released from custody.

Plaintiffs argue that the deprivation of care that they allege in fact occurred *during* their detention, because discharge planning occurs before release from custody. Their argument is consistent with the Complaint, which clearly purports to allege an in-custody deprivation of care. Whether Plaintiffs' claim for deprivation of discharge planning, which negatively affected them after their release from custody, can be considered a claim for in-custody deprivation of care is an important question in this case.

This distinction matters because the duties state actors owe to individuals differ depending on whether the complainant was in the state's custody. As a general matter, the state is under no constitutional duty to provide substantive

16

services to free persons within its borders. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). But when a person is involuntarily held in state custody, and thus wholly dependent upon the state, the state takes on an affirmative duty to provide for his or her "safety and general well-being." *Id.* at 199–200. This "special relationship exception" imposes a duty on the state in recognition of "the limitation which [the state] has imposed on [the person's] freedom to act on his own behalf." *Id.* at 200; *see also Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008).

In *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), the Supreme Court held that the state has a constitutional obligation to provide medical care to persons it is punishing by incarceration. When the state is deliberately indifferent to the medical needs of a person it has taken into custody, it violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 104. The Supreme Court subsequently extended the protections for prisoners established in *Estelle* to civil detainees under the Due Process Clause of the Fourteenth Amendment, reasoning that persons in civil detention deserve at least as much protection as those who are criminally incarcerated. *See Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

17

The Ninth Circuit has extended the reasoning of *Estelle* and *DeShaney* beyond the moment of release from custody, holding in *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999), that the state owes an affirmative duty to provide an outgoing prisoner requiring medication with a "supply sufficient to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply." The Ninth Circuit based this holding on a matter of common sense: "that a prisoner's ability to secure medication 'on his own behalf' is not necessarily restored the instant he walks through the prison gates and into the civilian world." *Id*. This Court, however, has never held that the state's duties to an inmate or detainee extend beyond their release.

Plaintiffs' theory in this case is that "[d]ischarge planning is an essential part of mental healthcare in institutional settings" and "Defendants are constitutionally obliged to provide Plaintiffs with adequate medical care while they are confined to immigration detention." App'x at 10. Plaintiffs allege that discharge planning includes providing the detainee with (1) a summary of medical records (including admission diagnosis, discharge diagnosis, all diagnostic test results, a list of medications prescribed, a summary of care

18

provided, a summary of the detainee's response to treatment, medical complications encountered, and any outside healthcare referrals); (2) an interim supply of medication; and (3) a continuity of care plan, including referrals to community based providers. Plaintiffs' Complaint alleges that the provision of these services and documents should begin being provided to the patient at the *outset* of in-custody medical treatment, and continue during the course of treatment.

Plaintiffs' theory raises a legal question of first impression in this Circuit: whether a claim of constitutional entitlement to discharge planning, the alleged inadequacy of which causes post-release harm, can be considered a claim to in-custody care cognizable under the "special relationship" exception. Discharge planning is fundamentally different from other measures or types of care to which detainees may be entitled while in custody, in that its entire purpose is to prevent post-release harm. Given the reality that the tangible harm Plaintiffs suffered was a direct result of their lack of medication and medical records *after* release from custody, the District Court understandably construed the Complaint as asserting "a right to post-release measures inherent in discharge planning." *Charles*, 2017 WL 4402576, at *8.

Nevertheless, discharge planning is not so different from other measures the state takes in providing care to those in its custody as to be categorically beyond the reach of the "special relationship" exception. If discharge planning is to occur at all, it must, by definition, occur prior to release from custody. Whether the three components of discharge planning that Plaintiffs identify are an "essential part" of mental healthcare, as Plaintiffs allege, is a factual matter that may be proven at a later stage of litigation by expert testimony. If discharge planning is essential to providing care for mentally ill individuals, the rationale for the "special relationship" exception applies to this need no less than the need for other types of care. As the Supreme Court recognized in *Estelle*, "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S. at 103. The Supreme Court in *Estelle* was concerned with failures to provide care that may result in death or "unnecessary" "pain and suffering." *Id*. The failure to provide discharge planning, no less than other forms of care, may inflict such suffering. In this case, furthermore, it cannot be said that when the County released Plaintiffs, it "placed [them] in no worse position than that in which [they] would have been had it not acted at all . . ." *DeShaney*, 489 U.S. at 201; *see* App'x at 18, 21–22 (Charles); *id*. at 24 (Small).

20

That the harmful consequences of a lack of discharge planning occur after release from custody does not remove discharge planning from the purview of the "special relationship" exception. For example, we affirmed application of this exception where an inmate died a few weeks after being released from custody, allegedly due to the facility's inadequate medical treatment. *Rodriguez ex rel. Estate of Darby v. Walrath*, 94 F. App'x 864 (2d Cir. 2004).[8]

Common sense and experience further support Plaintiffs' theory that discharge planning is part of in-custody care. It comports with common sense that someone with a serious mental illness would need to receive a summary of his medical records, including documents indicating his diagnosis and his prescribed medications. These aspects of a discharge plan are expected parts of

---

[8] Similarly, in *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 115 (N.D.N.Y. 2000), the plaintiff had surgery to remove kidney stones while incarcerated. He was released on parole shortly thereafter, but before Lugo's treating physician was able to remove a metal stent from his kidney. *Id.* Noting that Lugo "was undergoing continuing treatment at the time he was released," the district court held that releasing Lugo with the stent in his body, and without either allowing him to return to Albany for treatment or forwarding his medical records to another facility to facilitate the performance of the operation there constituted deliberate indifference. *Id.* Although Plaintiffs' theory in this case does not require us to reach the question of whether the state's duty of care extends beyond a detainee's release from custody, as the district court in *Lugo* held, the facts in *Lugo* illustrate how a failure to provide certain in-custody care may have harmful post-release effects that are inextricably bound up with that in-custody deprivation.

what non-incarcerated patients seek, and pay for, in visiting doctors and hospitals for treatment. Those who have seen a doctor, visited a hospital emergency room, undergone surgery, or received any kind of medical treatment for a serious physical, emotional, dental or visual problem, understand the need for, and have likely been provided, documentation of the medications prescribed to them, their diagnosis, and a copy of any test results, *during the course of their treatment*. Thus, to the extent Plaintiffs complain that they were not provided with documentation regarding the treatment they received while in custody, their complaint relates to the provision of in-custody medical care.

These common-sense understandings are consistent with expert medical opinion. Plaintiffs point to a broad array of professional mental health and medical associations who agree that the standard of reasonable and adequate medical care for detained persons includes providing the detainee with interim medications and referrals *while they are still in custody*. For example, the American Psychiatric Association views discharge planning as in-custody care, stating that it "needs to begin as part of the initial treatment plan." Brief of Bronx Defenders et al. as Amici Curiae Supporting Appellants at 21. The American Association of Community Psychiatrists says that "it is imperative that any psychiatric treatment provided *during a period of incarceration* include planning for post-

release follow-up care in the community." App'x at 30 (emphasis added). The National Commission on Correctional Health Care, from which the Jail has sought and obtained accreditation, defines discharge planning as "the process of providing sufficient medications for short-term continuity upon release and arranging for necessary follow-up mental health services *before the inmate's release* to the community." *Id.* at 31 (emphasis added). Such expert medical opinion supports the plausibility of Plaintiffs' claim of a deprivation of in-custody care.

We also find plausible Plaintiffs' contention that the provision of interim medication and referrals is part of the treatment that should have been provided to them while they were in custody. The American Psychiatric Association, the American Academy of Psychiatry and the Law, the American Psychological Association, the American Medical Association, the National Association of Social Workers, the American Public Health Association, and the Judge David L. Bazelon Center for Mental Health (collectively the "APA Amici") wrote in support of Plaintiffs to explain that discharge planning, which includes a sufficient quantity of medication to allow continuous use, conducting a pre-discharge assessment, establishing appointments with community providers, and ensuring that medical records are effectively transferred to community providers, is an essential component of minimally adequate mental health care

23

for institutional patients. APA Amicus Brief at 13–14. These views are consistent with how we think of medical services in a non-custodial setting. Doctors routinely provide their patients with instructions on how to treat their illnesses after they leave the doctor's office, provide their patients with referrals to other healthcare providers when necessary, and refill their patients' prescriptions so as to avoid a lapse in care. Such services are particularly essential for patients who are hospitalized or otherwise confined, to make possible continuity of care after their release.

That discharge planning is supposed to occur *before release* is also referenced in a variety of guidelines and regulations promulgated by correctional authorities. For example, ICE's own Performance Based National Detention Standards require discharge planning *prior to release.*[9]

Thus, taking Plaintiffs' allegations as true and drawing all reasonable

---

[9] That the contents of a discharge plan or package may be provided at or about the time of release does not defeat the claim that the preparation and planning for after-care is an inherent part of proper medical treatment. That a package of after-care instructions, medication, and medical equipment such as dressings or bandages is provided to a paying patient by a staff member on the way out of an emergency room or doctor's office by a nurse or receptionist, rather than in the treatment room itself by the primary care physician, does not mean that it is not an inherent part of the treatment required of the doctor or hospital; the same is true for a patient who is in custody.

inferences in their favor, we find that Plaintiffs have plausibly alleged that

discharge planning is an essential part of in-custody care. We conclude that

despite the forward-looking nature of discharge planning, a claim for damages

caused by the lack of it can be considered a claim for deprivation of in-custody

care for purposes of the "special relationship" exception. It will be for Plaintiffs to

prove to a fact-finder, on remand, that the care they complain of is the type that

should have been provided to them during their detention.[10]

## II. The Appropriate Standard for the Deprivation of In-Custody Care

Once we accept that Plaintiffs' theory regards the adequacy of medical care

Plaintiffs received *while in custody*, the legal framework that applies to their claim

becomes clear. It is well established that when the state takes a person into

custody, severely limiting his ability to care for himself, and then is deliberately

indifferent to his medical needs, the Eighth Amendment's proscription against

---

[10] In recognizing that Plaintiffs' claim for deprivation of discharge planning may be cognizable under the "special relationship" exception, we do not hold that any detainee who receives medical treatment while detained and subsequently suffers a potentially preventable health problem may assert a Fourteenth Amendment claim by alleging inadequate discharge planning. The facts alleged in this case show a clear causal link and temporal proximity between the lack of discharge planning and the negative effects on Plaintiffs, in addition to a serious medical need for discharge planning and deliberate indifference to that need, as discussed below.

the unnecessary and wanton infliction of pain is violated. *Estelle*, 429 U.S. at 104.

That is true whether the deliberate indifference is manifested by prison doctors in

their response to the prisoner's needs, or by prison guards who intentionally

deny or delay access to medical care or intentionally deny or delay access to the

treatment once prescribed. *Id*. at 104–05. The *Estelle* Court concluded that to state

a cause of action under § 1983 for violations of the Eighth Amendment's Cruel

and Unusual Punishment Clause, a prisoner must show that the state was

deliberately indifferent to his or her medical needs. *Id*. at 105. As discussed

above, pursuant to the Due Process Clause of the Fourteenth Amendment, the

Supreme Court has extended to civil detainees *Estelle's* protection for prisoners

under the Eighth Amendment. *See Youngberg*, 457 U.S. at 321–22; *City of Revere*,

463 U.S. at 244. Thus, those in civil detention, as were Plaintiffs in this case, are

also afforded a right to be free from deliberate indifference to their serious

medical needs.

"In order to establish a violation of a right to substantive due process, a

plaintiff must demonstrate not only government action but also that the

government action was so 'egregious, so outrageous, that it may fairly be said to

shock the contemporary conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir.

2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). The

Supreme Court has held that the point of conscience shocking is reached when government actors are deliberately indifferent to the medical needs of pretrial detainees. *Lewis*, 523 U.S. at 849–50; *see Estelle*, 429 U.S. at 104–06; *City of Revere*, 463 U.S. at 244. In this particular context, "deliberately indifferent conduct" is "egregious enough to state a substantive due process claim." *Lewis*, 523 U.S. at 849–50. A court need not, therefore, conduct a separate analysis, over and above the deliberate indifference analysis, of whether the state's conduct "shocks the conscience."[11]

In accepting, at this stage, Plaintiffs' theory that discharge planning is an essential part of in-custody medical care and that Plaintiffs were therefore deprived of adequate medical care while in state custody, Plaintiffs fall well within the "special relationship" exception. Therefore, Plaintiffs' Fourteenth Amendment claim must meet two requirements: (1) that Plaintiffs had a serious medical need for discharge planning, and (2) that the Defendants acted with

---

[11] We have applied a separate "shocks the conscience" analysis in cases that do not involve the medical needs of those the state has taken into custody. *See, e.g.*, *Matican*, 524 F.3d at 155 (requiring plaintiff to show conscience-shocking behavior on the part of the state where plaintiff confidential informant was harmed while on the streets, not in a prison or jail); *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007) (requiring proof of conscience-shocking behavior when plaintiffs alleged government made false assurances that workplace would be safe, although plaintiffs were not in custody).

27

deliberate indifference to such needs. *See Estelle*, 429 U.S. at 105*; Darnell v. Pineiro*, 849 F.3d 17, 29 (2017).

## A. Serious Medical Needs

Depending on their severity, psychiatric or psychological conditions can present serious medical needs in light of our contemporary standards. *See e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). In determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, we consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm. *See Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

**B.      Deliberate Indifference**

The concept of deliberate indifference has a more complicated history in this Circuit. *See Darnell*, 849 F.3d at 32–36 (explaining how the concept of deliberate indifference has evolved in the case law since *Farmer v. Brennan*, 511 U.S. 825 (1994)). In *Darnell*, we clarified that deliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind. 849 F.3d at 33–34. Deliberate indifference, we held, can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known,* that the condition posed an excessive risk to [the plaintiff's] health or safety." *Id*. at 35 (emphasis added). This formulation of the deliberate indifference standard was developed in cases involving unconstitutional conditions of confinement. In *Darnell*, the plaintiffs complained, *inter alia*, that the facility where they were detained was unsafe and unsanitary. *Id*. at 23–26. Although *Darnell* did not specifically address medical treatment,  the same principle applies here. *See id.* at 33 n.9 (noting that the same

29

standard applies to claims for deliberate indifference to medical needs because "deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment").

A plaintiff must show "something more than mere negligence" to establish deliberate indifference in the Fourteenth Amendment context. *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). Thus, "mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco*, 222 F.3d at 107 (internal quotation marks and alteration omitted).

Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.

Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence. *Farmer*, 511 U.S. at 842; *see also Hathaway*, 37 F.3d at 67–69 (whether doctor was deliberately indifferent to inmate's serious medical needs was for jury). "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Thus, to sustain their § 1983 cause of action, Plaintiffs must plausibly allege that they had a sufficiently serious medical need requiring discharge planning and that the deprivation of such planning was inflicted under circumstances constituting deliberate indifference.

### III.  Whether Plaintiffs Had Sufficiently Serious Needs Requiring Discharge Planning

Plaintiffs have plausibly alleged that they had a sufficiently serious need for discharge planning given their serious mental illnesses. Plaintiffs' mental illnesses cause paranoia, delusions, hallucinations and aggressive shifts in mood when they go untreated. Without continuous care and daily medication to keep them mentally stable, Plaintiffs face serious risk of physical and psychological harm.

Plaintiffs' theory that discharge planning is integral to institutional mental

31

health care is supported by their citations to professional organizations in the mental health field. Many professional organizations that determine appropriate standards of mental health care regard discharge planning as an essential component of care for the institutionalized mentally ill, including not only sentenced prisoners and civil and criminal detainees with serious mental illnesses, but also those, whether voluntarily hospitalized or involuntarily committed, who are institutionalized for the very purpose of treating their mental illnesses. For example, Plaintiffs point to guidance by the American Psychiatric Association, the primary professional association of psychiatrists in the United States and the largest psychiatric professional organization in the world, which recognizes that "[t]imely and effective discharge planning is essential to continuity of care and an integral part of adequate mental health treatment." App'x at 29.

Plaintiffs' allegations regarding the importance of discharge planning are corroborated by what befell them when such planning was not provided to them. *See Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996). Because Plaintiffs were not provided with discharge plans, Plaintiffs allege they both faced an abrupt interruption in their care causing them to suffer significant mental health

consequences. Charles suffered complete psychiatric decompensation shortly after being released. His family was forced to call 911 for emergency medical care and he required two months of hospitalization to regain mental stability. Small was somewhat more fortunate. She received treatment before she fully decompensated, but she was still forced to check herself into a hospital emergency room within days of her release and continues to suffer extreme emotional and psychological distress.

We therefore find plausible Plaintiffs' allegations that they had serious medical needs requiring discharge planning. Of course, those are only allegations: we leave it to the fact-finder, or to summary judgment after discovery, to determine whether the facts, as developed, prove that Plaintiffs had a serious medical need requiring discharge planning and if so, in what form.

## IV. Whether the Defendants' Failure to Provide Discharge Planning to Plaintiffs Constituted Deliberate Indifference

Plaintiffs have also sufficiently alleged that Defendants knew or should have known that failing to provide them with discharge planning would cause Plaintiffs substantial harm. According to Plaintiffs, Defendants knew the serious nature of Plaintiffs' mental health conditions; they diagnosed Plaintiffs,

maintained their medical records, created treatment plans for them, and prescribed anti-psychotic and anti-depressant medication for them. As noted above, Plaintiffs point to guidance by, among others, the American Psychiatric Association and the National Commission on Correctional Health Care, stating that discharge planning is an essential component of adequate institutional mental healthcare for people with Plaintiffs' illnesses. It is reasonable to infer, at this stage, that the defendant clinic directors, as mental health professionals engaged in providing treatment to prisoners and detainees in an institutional setting, were aware of these standards.

Nor is it necessary to resort solely to inference. The policies and protocols governing Defendants and others providing treatment at the Jail themselves demand such discharge planning. Both ICE and Orange County have written policies recognizing that mental health discharge planning is an essential component of mental health treatment in institutional settings. ICE's 2011 Performance-Based National Detention Standards (revised in 2016) provide that "[d]etainees, who have received medical care, [been] released from custody or removed shall receive a mental health discharge plan, a summary of medical records, any medically necessary medication and referrals to community-based

34

providers as medically appropriate." App'x at 32 (alterations omitted). Orange County policies similarly require that "[n]o client shall be discharged without a discharge plan" which "shall be given to the client upon discharge." *Id.* at 130.

Indeed, according to Plaintiffs, Defendants regularly provide discharge planning to individuals who are held at the Orange County Detention Center in criminal detention in accordance with these standards—demonstrating Defendants' understanding that discharge planning is important for mentally ill inmates. In Charles's case, the Mental Health Department expressly recognized that Charles would have "projected mental health needs" in his Discharge Summary. *Id.* at 152.

Thus, Plaintiffs have plausibly alleged that Defendants were fully aware of, and violated, both Orange County and ICE policies by failing to provide them with discharge planning as part of their care. Plaintiffs' allegations, if proven true, are sufficient to establish that Defendants knew, or should have known, of the substantial risk that Plaintiffs would relapse and suffer serious adverse health consequences if they were not provided with necessary discharge planning, such that a fact-finder could infer "reckless disregard" beyond mere negligence or medical malpractice. *Weyant*, 101 F.3d at 856; *see Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).

## V. Issues Remaining for Factual Development

That Plaintiffs have adequately stated a claim does not, of course, mean that they have established their entitlement to relief. Plaintiffs will need to provide evidence to back up their allegations. Moreover, Defendants have raised significant factual issues that need to be fleshed out through discovery. These include: whether the discharge planning measures Plaintiffs identify should be provided as part of in-custody care (rather than undertaken upon or after release), the medical effects of a temporary deprivation of psychotropic medication, the causal relationship between the alleged interruption in Plaintiffs' treatment and the consequences they complain of, and whether the circumstances of Plaintiffs' release were so unexpected that Defendants could not have anticipated, and properly planned for, their release at the time it occurred. Moreover, Plaintiffs' own allegations about the existence of written Orange County policies call into question whether Plaintiffs can establish their contention that there is a consistent policy, custom, or practice of denying such planning to immigrant detainees. After discovery, the district court will be in a better position to determine the precise parameters of the treatment that should have been provided; whether the failure to provide any mandated care was attributable to Defendants' deliberate indifference, mere negligence, or unforeseen and

unforeseeable circumstances; and what, if any, damages were caused by any dereliction on the part of Defendants.[12] But, at the pleading stage, we hold that Plaintiffs have adequately stated a Fourteenth Amendment substantive due process claim.

## CONCLUSION

For the foregoing reasons, we VACATE the district court's opinion and REMAND for proceedings consistent with this opinion.

---

[12] In addition, the district court may consider, on remand, various issues it did not reach in its September 29, 2017 opinion, and on which we express no opinion, such as: (1) whether the Plaintiffs adequately pled a county policy, practice, or custom for purposes of *Monell* liability; (2) whether Plaintiffs have adequately stated a claim against Elizondo; and (3) whether Elizondo is entitled to qualified immunity.