23-0040
Lara-Grimaldi v. County of Putnam

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2023

(Argued: January 12, 2024                    Decided: March 27, 2025)

Docket No. 23-0040

_____

NANCY LARA-GRIMALDI, Individually and as Administratrix of the Estate of ALEXANDRA GRIMALDI, Deceased,

*Plaintiff-Appellant*,

- v. -

COUNTY OF PUTNAM, Putnam County Sheriff DONALD SMITH, Putnam County Sheriff's Department Sergeant KAREN JACKSON, Putnam County Sheriff's Department Correction Officer WILLIAM SPINELLI, Putnam County Sheriff's Department Correction Officer STEVEN NAPOLITANO, Putnam County Sheriff's Department Officer ANGELA MCGOORTY, Putnam County Sheriff's Department Correction Officer JENNIFER WILKINSON, Putnam County Sheriff's Department Correction Officer KEITH PUHEKKER, Putnam County Sheriff's Department Correction Officer MICHELLE NIGRO, Putnam County Sheriff's Department Correction Officer JOHN CASSIDY, Putnam County Sheriff's Department Correction Officer RICHARD GREAGOR, Putnam County Sheriff's Department Correction Officer ANTHONY COLELLO, Putnam County Sheriff's Department Correction Officer TRUDY GIAMPAOLO, Putnam County Sheriff's Officers JOHN and/or JANE DOES 1, 2, 3, etc., and Putnam County Correctional Facility Medical Officials JOHN and/or JANE DOES 1, 2, 3, etc., in their official and individual capacities,

*Defendants-Appellees,*

Putnam County Correctional Facility Nurse CHRISTOPHER STEWART,

*Defendant*[*].

_____

Before:  KEARSE, LYNCH, and NARDINI, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York, Kenneth M. Karas, *Judge*, dismissing plaintiff's action seeking damages under 42 U.S.C. § 1983 and New York State law from defendants County of Putnam ("County") and numerous County employees for the death of her daughter Alexandra Grimaldi ("Grimaldi"), who succumbed after attempting suicide during acute heroin withdrawal while she was a pretrial detainee in a County jail. The district court granted summary judgment dismissing plaintiff's § 1983 claims against correction employees Karen Jackson, Steven Napolitano, and Michelle Nigro for deliberate indifference to Grimaldi's health and safety, *see Lara-Grimaldi v. County of Putnam*, 529 F.Supp.3d 88 (S.D.N.Y. 2021)--and a § 1983 *Monell* claim against the County for deliberate indifference to suicide-prevention needs of pretrial detainees,

---

[*]  As against previously named defendant Christopher Stewart, this action was dismissed following the filing of a notice of his death, *see* No. 17-CV-622, Dkt. Nos. 96, 112, 113.  The Clerk of Court is instructed to amend the official caption to conform with the above.

*see Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2022 WL 17541815 (S.D.N.Y. Dec. 6, 2022)--concluding that no reasonable jury could find that these individual defendants knew or should have known that there was an excessive risk that Grimaldi would attempt suicide. The court declined to exercise supplemental jurisdiction over plaintiff's state-law claims.

On appeal, plaintiff contends that in granting summary judgment in favor of Jackson, Napolitano, and Nigro, the district court applied erroneous legal standards and failed to accept inferences that a jury could reasonably draw from facts these defendants knew as to the level of supervision needed to foster Grimaldi's continued health and safety, given her mental health issues, her likely heroin withdrawal, and her past attempted suicide. For the reasons that follow, we conclude that the record does not support the summary dismissal of plaintiff's § 1983 claim against Nigro, and we vacate the dismissal of that claim--as well as the state-law claims against Nigro, Jackson, Napolitano, and the County--and remand for further proceedings on those claims. The remainder of the judgment is affirmed.

Affirmed in part, vacated in part, and remanded.

> DAVID B. RANKIN, New York, New York (Beldock Levine & Hoffman, New York, New York, on the brief), *for Plaintiff-Appellant*.

- 3 -

DREW W. SUMNER, White Plains, New York (James A. Randazzo, Portale Randazzo, White Plains, New York on the brief), *for Defendants-Appellees other than Michelle Nigro.*

DEANNA L. COLLINS, White Plains, New York (Lewis R. Silverman, Silverman & Associates, White Plains, New York, on the brief), *for Defendant-Appellee Michelle Nigro.*

KEARSE, *Circuit Judge*:

Plaintiff Nancy Lara-Grimaldi (or "Plaintiff") appeals from a judgment of the United States District Court for the Southern District of New York, Kenneth M. Karas, *Judge*, dismissing her action seeking damages under 42 U.S.C. § 1983 and New York State law from defendants County of Putnam ("County") and numerous County employees for the death of her daughter Alexandra Grimaldi ("Grimaldi"), who succumbed after attempting suicide during acute heroin withdrawal while she was a pretrial detainee in a County jail. The district court granted summary judgment pursuant to Fed. R. Civ. P. 56, principally dismissing (a) Plaintiff's § 1983 claims against correction employees Karen Jackson, Steven Napolitano, and Michelle Nigro for deliberate indifference to Grimaldi's health and safety, *see Lara-Grimaldi v. County of Putnam*, 529 F.Supp.3d 88 (S.D.N.Y. 2021) ("*Lara-Grimaldi I*"), and (b) a § 1983 *Monell* claim against the County for deliberate indifference to suicide-prevention needs of

- 4 -

pretrial detainees, *see Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2022 WL 17541815 (S.D.N.Y. Dec. 6, 2022) ("*Lara-Grimaldi II*"), concluding that no reasonable jury could find that these individual defendants knew or should have known that there was an excessive risk that Grimaldi would attempt suicide. The court declined to exercise supplemental jurisdiction over Plaintiff's state-law claims.

On appeal, Plaintiff contends that in granting summary judgment in favor of Jackson, Napolitano, and Nigro, the district court applied erroneous legal standards and failed to accept inferences that a jury could reasonably draw from facts these defendants knew as to the level of supervision needed to foster Grimaldi's continued health and safety, given her mental health issues, her likely heroin withdrawal, and her past attempted suicide. For the reasons that follow, we conclude that the record does not support the summary dismissal of Plaintiff's § 1983 claim against Nigro, and we vacate the dismissal of that claim--as well as the state-law claims against Nigro, Jackson, Napolitano, and the County--and remand for further proceedings on those claims. The remainder of the judgment is affirmed.

# I. BACKGROUND

On October 27-28, 2015, 23-year-old Alexandra Grimaldi was--and had been on several prior occasions--a pretrial detainee at the Putnam County Correctional Facility ("PCCF" or "Facility"). Defendants Napolitano and Nigro were PCCF correction officers; defendant Jackson was a County sergeant at the Facility. Much of the sequence of events leading to this lawsuit is undisputed, as reflected principally (a) in the statements pursuant to Local Rule 56.1 submitted, respectively, by Nigro and by six other PCCF staff members and the County ("Other Defendants") as to the facts that they asserted were not genuinely in dispute and entitled them to summary judgment, and (b) in such responses by Plaintiff as admitted those factual assertions (hereafter "Plaintiff's and Nigro's Rule 56.1 Statements" or "Plaintiff's and Other Defendants' Rule 56.1 Statements"). Unless otherwise indicated, facts described in Part A are undisputed.

A. *Relevant Events of October 27-28, 2015*

1. *October 27*

On the afternoon of October 27, 2015, Grimaldi was arrested for an alleged probation violation and was charged with that violation and with criminal possession of marijuana and criminal possession of a hypodermic needle. After being arraigned, she was taken to PCCF. Napolitano, who was then the PCCF "booking" officer, rejected Grimaldi from intake and referred her to the PCCF medical staff because of a knee laceration. After having her knee examined by a PCCF nurse and receiving treatment at a hospital, Grimaldi was returned to PCCF for booking.

In the Facility's general intake procedure, detailed "Screening Guidelines [we]re used" by "PCCF to recommend the level of supervision" to be given a detainee or other inmate. (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 10.) PCCF's suicide prevention procedures required staff assessments as to whether the inmate should be given "routine" supervision, in which a correction officer (or "CO") performs a general supervisory check "every 30 minutes," or "15 minute check[s]," or "constant supervision." (*Id*. ¶ 11.) "The 15-minute supervision is . . . the same" as the routine 30-minute check," but the checks are performed "more often." (Deposition of Sheriff Donald B. Smith ("Sheriff Smith Dep.") at 56.) The Screening Guidelines

provided that "[c]onstant supervision must be instituted if it is determined that the inmate is at risk for suicide." (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 13.)

The initial recommendation for an inmate's level of supervision was to be made by the booking officer, with the recommendation to be reviewed by a sergeant. (*Id.* ¶¶ 10, 17.) "PCCF maintain[ed] the Screening Guidelines of inmates who were previously incarcerated at the [F]acility," and "[t]he booking officer" was to "review[] any prior Screening Guidelines for an individual being admitted into PCCF before recommending a level of supervision." (*Id.* ¶¶ 14-15.) In addition, "[a] nurse from the [PCCF] medical unit" was to "examine[] the inmate, review[] the Screening Guidelines and make[] his or her own determination as to the level of supervision that [wa]s required." (*Id.* ¶ 18.)

Grimaldi, in her intake proceeding at PCCF on October 27, 2015, informed Napolitano that on the previous day she had injected two bundles of heroin (*see id.* ¶ 42); "[t]wo bundles is twenty bags," which "[i]s a significant amount" (Deposition of Steven Napolitano ("Napolitano Dep.") at 30). Grimaldi also told Napolitano that she suffered from bipolar disorder and that, four years earlier, she

had attempted suicide. (*See*, *e.g.*, Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 42.)

"Napolitano knew Grimaldi from her prior incarcerations at PCCF" (*id*. ¶ 26), and he reviewed her past PCCF Suicide Prevention Screening Guidelines forms ("Suicide Screening forms") (*id*. ¶ 44). He determined that her answers to his questions at intake on October 27, 2015, were similar to her prior answers in PCCF files, as reproduced in the appendix on appeal ("App."). (*See* Napolitano Dep. 16-18, 35-36.) The July 26, 2012 PCCF Suicide Screening form for Grimaldi, for her "first incarceration in lockup/jail," noted her use of heroin that morning and recorded her prior suicide attempt approximately one "year ago" by "cutting," "overdose." (App. 371.) The September 20, 2012 PCCF Suicide Screening form for Grimaldi noted her use of heroin, her history of mental health counseling, and her suicide attempt "2 years ago--wrist." (App. 372.) The December 1, 2014 PCCF Suicide Screening form for Grimaldi noted her use of heroin the day before and her attempted suicide three years earlier by "OD." (App. 374.)

"Grimaldi was not placed under constant supervision during any of her prior incarcerations." (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 20.) In the intake screenings of Grimaldi in July 2012, September 2012, and December

2014, the intake officer had recommended that Grimaldi be given 15-minute supervision. (*See, e.g.*, App. 372 (PCCF Suicide Screening form dated September 20, 2012 ("c/o recommend[ed] 15 min s/v watch due to possible detox," although inmate "states she is not suicidal")).) However, at Grimaldi's booking into PCCF in 2013, the screening officer recommended "routine watch." (App. 373 (PCCF Suicide Screening form dated March 25, 2013).) On that form--unlike Grimaldi's screening forms in 2012 and 2014--the box as to whether there had been a prior suicide attempt was checked "No" (*id.*).

On October 27, 2015, Napolitano recommended--and Jackson, the sergeant in charge, concurred--that Grimaldi be given "routine" supervision. Grimaldi was also evaluated by defendant Christopher Stewart, a PCCF nurse, who memorialized that interview in his notes (the "Stewart Notes" or "Notes"). "Nurse Stewart performed his own medical intake portion of the booking process," and his "medical evaluation included a mental health evaluation and he found Grimaldi to be within normal limits." (Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 58-59.) "Nurse Stewart saw no evidence of suicidal ideation, plan or intent during his examination of Grimaldi." (*Id.* ¶ 63.)

Stewart also evaluated Grimaldi using the Clinical Opiate Withdrawal Scale ("COWS"), which measures and assigns numerical values to various symptoms of drug withdrawal. Grimaldi's COWS score on October 27 was "mild." (*Id*. ¶¶ 69-71.) Stewart noted that Grimaldi requested "Gatorade because she suffers dehydration during withdrawal and denied unmanageable depression or anxiety." (*Id*. ¶ 62.)

Stewart agreed with Napolitano's recommendation at intake to give Grimaldi "routine supervision," but with the "understanding [that] this issue may need to be revisited if symptoms of withdrawal reemerge." (Stewart Notes; *see* Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 64-65.) COWS procedures called for evaluations "every eight hours to monitor for changes." (Plaintiff's and Nigro's Rule 56.1 Statements ¶ 73.)

After the intake proceedings, Grimaldi remained in a holding cell until she was taken to her cell in PCCF's South Housing Unit (or "South Housing") shortly after 11:30 p.m. The overnight hours were apparently uneventful.

2. *October 28*

On October 28, 2015, Correction Officer Nigro was scheduled for a double-shift at PCCF from 7:30 a.m. to 11:30 p.m. From 7:30 a.m. to 3:30 p.m., she was "the housing officer in [South Housing]," which included Grimaldi's cell. (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 68; *see, e.g.,* Deposition of Michelle Nigro ("Nigro Dep.") at 16-17, 29-30, 36; Napolitano Dep. 60-61.) At a briefing before her double-shift, Nigro--who had been employed at PCCF since 2005--learned that Grimaldi, whom she knew from Grimaldi's prior incarcerations at PCCF, "was back." (Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 79, 87-88.) Nigro "thought [Grimaldi] was a troubled girl," "'[c]ause she always came in for drugs." (Nigro Dep. 27.) At the October 28 briefing, "there was no discussion that Grimaldi expected to experience withdrawal symptoms." (Plaintiff's and Nigro's Rule 56.1 Statements ¶ 87.)

Nigro's responsibilities during her shift involved the "[c]are, custody and control" of the inmates, "mak[ing] sure they're okay." (Nigro Dep. 17.) For inmates on a "regular . . . supervision schedule," Nigro testified, "You walk--you have to check them every thirty minutes"; "[l]ike you make sure they're okay, every thirty minutes." (*Id*. at 20.)

At about 10 a.m. on October 28, Nigro took Grimaldi to the nursing station for a second COWS assessment. Grimaldi's second COWS score was still within the "mild" range. (*See* Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 74-75, 96.) According to a written statement by PCCF Nurse Ibellis Diaz, who was present during this COWS evaluation (*see* Deposition of Ibellis Diaz ("Diaz Dep.") at 16-17, 57-60), "[a]t that time [Grimaldi] complained about mild withdrawal symptoms" (Diaz Dep. Exhibit 1). (*See also* Part II.C. below.)

At about 1 p.m., Nigro again took Grimaldi to the nursing station, for purposes that remain unclear and are in dispute. It is undisputed that during that visit, Grimaldi requested a prescription for Clonidine, "a blood pressure medication" that is also "used to treat withdrawal symptoms, including anxiety[;] it reduces signs and symptoms of withdrawal and has a calming effect." (Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 77-78.) As discussed in Part I.C.1. below, the parties disagree as to what Grimaldi may have said with regard to her anticipation of need for the Clonidine. There is no record that Grimaldi received Clonidine.

In addition to the two visits to the nursing station, Nigro took Grimaldi outside for a cigarette break, took her to watch television, and took her to get a book. (*See* Plaintiff's and Nigro's Rule 56.1 Statements ¶ 96.) Nigro's last interaction with

Grimaldi that day was locking her into her cell (*see id*. ¶ 102), which was approximately 2:30 p.m. (*see* Part I.B. below.)

At 3:18 p.m., another correction officer, defendant John Cassidy, found Grimaldi hanging by a bed sheet from the bars of her cell, having attempted to commit suicide. (*See*, *e.g.*, Plaintiff's and Nigro's Rule 56.1 Statements ¶ 105; Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 87.) According to PCCF records, "[Grimaldi] was not breathing & had no pulse." (App. 213; *see also* Diaz Dep. 22-23.)

Cassidy and other correction officers were eventually able to cut the sheet to get Grimaldi down, and--assisted by nurses--to render CPR before paramedics arrived. After Grimaldi began trying to breathe and regained a pulse, she was taken to a hospital. (*See*, *e.g.*, Plaintiff's and Nigro's Rule 56.1 Statements ¶ 108; Plaintiff's and Other Defendants' Rule 56.1 Statements ¶¶ 1, 87-92, 99-105); Diaz Dep. 27-29.) Remaining incapacitated, Grimaldi died on May 13, 2016. (*See* Plaintiff's and Other Defendants' Rule 56.1 Statements ¶ 2).

B. *The County's Investigation*

The County promptly began an investigation into Grimaldi's attempted suicide. Inmate Reneé Loria had been moved into the cell next to Grimaldi's on

- 14 -

October 28. That evening, she gave the investigator a two-page statement (*see* Sworn Affirmation of Reneé Loria, October 28, 2015, at 7:02 p.m. ("Loria Aff.")) that included the following. Loria stated that on October 28 when she was

> moved to cell 27 in the South Housing Unit, . . . an inmate was already in the next cell, cell 28. She introduced herself to me as Alex and the CO's called her Grimaldi.

(*Id*. at 1.) On that afternoon, Loria went to her cell "at around 2:30" in preparation "for shift change and Alex was already in her cell." (*Id*.) At around 2:45, Loria heard Grimaldi in her bed ("I could hear her feet moving in the sheets") and "heard her moan a few times." (*Id*.) When Loria asked what was wrong, Grimaldi

> replied to me that she is "detoxing." Maybe 5 or 7 minutes later I could hear her still in bed and she said, "I can't do this." After that she got up and I could hear her yelling for the CO, saying, "Ms. Nigro." She yelled twice. She then started banging on the bars on the gate to her cell.

(*Id*.) Loria's estimate, based on a "show on Discovery channel," was that "the banging was around 3 pm." (*Id*.) She stated that thereafter she

> didn't hear anything . . . for what seemed like 15 minutes until another CO came. He was doing checks . . . . When he came he looked in my cell then in Alex[']s cell and he then said, "Oh Shit" and ran out. He immediately came back with 4 or 5 additional COs. I could hear them yelling to "get her down" and "cut her down" and "we need scissors." That's how I knew she was hanging in there.

- 15 -

(*Id*. at 1-2.)

Loria's description of the area around her cell on the afternoon of October 28 thus indicated that Nigro did not respond to Grimaldi's yells for "'Ms. Nigro'" or to her banging on the cell bars, and that Nigro had not visited that cell area from at least 2:30 through the time that Grimaldi was found hanging in her cell at 3:18.

In contrast to Loria's Affirmation, Nigro made an entry in PCCF's South Housing Cell Log for October 28, 2015, stating that she had made a cell check there at "1500," *i.e.*, 3:00 p.m. In addition, Nigro sent the County Sheriff a memorandum stating, in pertinent part, that on

> October 28, 2015 at 1455 hours [*i.e.*, 2:55 p.m.], . . . this writer did a routine check of South Housing to secure all cells before shift change. This writer asked Inmate GRIMALDI, ALEXANDRA #25242 cell 028 and Inmate LORIA, RENEE [*sic*] #24922 cell 027 if they needed anything else before they were locked in for shift change. Both inmates answered "No."

(Memorandum from Correction Officer Michelle Nigro to Sheriff Donald B. Smith dated October 28, 2015 ("Nigro Memorandum").)

The County, however, had surveillance cameras strategically situated at PCCF to help monitor the Facility. (*See* Sheriff Smith Dep. 52, 125-26).) Sheriff Smith,

at his deposition, viewed the PCCF surveillance video for the South Housing area on the afternoon of October 28, 2015, and was able to determine whether--and when-- Nigro appeared in the video. He testified that while the actual times displayed "may be off on the calibration of the video," the video was accurate as to lengths of "time lapsed"; and the video showed that "approximately forty minutes passed between the time that Ms. Nigro was last seen in the South Housing Unit and the time that Officer Cassidy found Ms. Grimaldi . . . ." (*Id*. at 147-48.)

Based on what he saw in the video, Sheriff Smith found that "Nigro's entries in her log were not an accurate portrayal of what she actually did on October 28th, 2015." (*Id*. at 141-42.) He concluded that in Nigro's memorandum, her representation that only 23 minutes elapsed between her last supervisory check on Grimaldi and Cassidy's discovery of Grimaldi hanging in her cell was thus "inaccurate," and Nigro's claim of appropriate supervision of Grimaldi was "false." (*Id*. at 148-49.)

C. *The Present Action and the District Court Decisions*

Plaintiff, individually and as Grimaldi's administratrix, commenced this action in 2017 and filed a second amended complaint ("SAC") in 2018 against the

County and more than a dozen named individual defendants, plus at least six "John" or "Jane" "Doe" defendants identified only as County "Sheriff's Officers" or PCCF "Medical Officials."  The SAC asserted, *inter alia*, § 1983 claims against Jackson, Napolitano, Nigro, and most of the other individual defendants for deliberate indifference to Grimaldi's Fourteenth Amendment due process rights; state-law claims against those individual defendants and the County for wrongful death, negligence, and violation of Grimaldi's state constitutional rights; a state-law claim against the County for respondeat superior; and a § 1983 *Monell* claim against the County, alleging a municipal policy, custom, or practice of failing to train correction staffs as to the risk of suicide by detainees likely to undergo drug withdrawal.

With respect to the individual defendants other than Jackson, Napolitano, and Nigro, the district court granted motions to dismiss the SAC in various rulings.  *See* Opinion and Order dated August 1, 2019 (D.Ct. Dkt. 111); *Lara-Grimaldi I*, 529 F.Supp.3d at 92 n.1; *id*. at 104 n.14; *Lara-Grimaldi II*, 2022 WL 17541815, at *5. None of those rulings are challenged on this appeal.  In the published decisions, the court granted summary judgment dismissing Plaintiff's § 1983 claims against Jackson, Napolitano, and Nigro, *see Lara-Grimaldi I*, 529 F.Supp.3d at 92,and

the § 1983 *Monell* claim against the County, *see Lara-Grimaldi II*, 2022 WL 17541815, at *3-*4.

1. *Summary Judgment Motions by Jackson, Napolitano, and Nigro*

On March 13, 2020, Nigro moved for summary judgment dismissing the claims against her, and the Other Defendants moved for summary judgment dismissing the claims against them. In support of their motion, the Other Defendants submitted, *inter alia*, records of Grimaldi's intake at PCCF on October 27, documents setting out PCCF suicide-prevention-screening policies and procedures; transcripts of the depositions of virtually all of the named individual defendants--other than Nurse Stewart who had died--and of Nurse Diaz who was not a defendant; and the transcripts of two depositions of Plaintiff (*see* Deposition of Nancy Lara-Grimaldi, June 4, 2019 ("Lara-Grimaldi Dep."), and 50-h Deposition of Nancy Lara-Grimaldi, January 17, 2017 ("Lara-Grimaldi 50-h Dep.")). Nigro, in support of her motion for summary judgment, presented excerpts from many of the depositions submitted by the Other Defendants.

Nigro and the Other Defendants argued that the facts set out in their respective Rule 56.1 Statements showed that the individual defendants had followed proper procedures in interviewing and observing Grimaldi, and that as a matter of

law defendants could not be found deliberately indifferent to the risk that she might attempt suicide. In addition to the undisputed facts described in Part I.A. above, defendants in their Rule 56.1 Statements asserted facts that Plaintiff challenged but that defendants contended should be accepted as true.

Most of the defendants' Rule 56.1 factual contentions that Plaintiff challenged consisted of, or included representations as to, various individual defendants' observations of Grimaldi or statements or understandings that they attributed to Grimaldi. For example, the Other Defendants asserted, citing Napolitano's deposition testimony, that during the PCCF intake process "Grimaldi reported to Napolitano that she felt ok and said that she was not going to hurt herself." (Other Defendants' Rule 56.1 Statement ¶ 32.) Plaintiff responded: "Disputed, there is no reason to accept Napolitano['s] self-serving testimony," citing "*O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ('Further, given the difficult problem posed by a suit for the use of deadly force, in which "the witness most likely to contradict [the police officer's] story--the person shot dead--is unable to testify[,] . . . . the court may not simply accept what may be a self-serving account by the police officer. . ."[']).'" (Plaintiff's Rule 56.1 Statement ¶ 32 & n.1, in response to Other Defendants.)

Plaintiff also sought to dispute the Other Defendants' claims that Grimaldi made certain statements to Nurse Stewart in the intake procedure, principally their assertions that "Grimaldi told Stewart that she had withdrawn from heroin in the past at PCCF, was aware of the likely progression and supportive care; said that she would do fine"; "that she did not presently have any symptoms but expected to have them the next day"; and that she "denied unmanageable depression or anxiety and Nurse Stewart concluded there was no evidence of suicidal, homicidal or assaultive ideation, plan or intent." (Other Defendants' Rule 56.1 Statement ¶¶ 53, 55.) Plaintiff did not dispute that these were "accurate reflection[s] of the record" as to Nurse Stewart's notes, but she disputed the assertions insofar as they purported to describe "Ms. Grimaldi's statement[s] or conclusions about her understanding of the situation." (Plaintiff's Rule 56.1 Statement ¶¶ 53, 55.)

Nigro's Rule 56.1 Statement likewise contained several assertions attributing statements--or lack of statement--to Grimaldi. With respect to the intake process on October 27 (in which Nigro was not involved), these assertions included the following:

- that "Grimaldi advised Corrections Officer Napolitano that she 'felt okay'";

- 21 -

■ that "Napolitano asked Grimaldi if she was going to hurt herself and she said 'no'";

■ that "Napolitano asked Grimaldi how she was feeling while she was in the holding cell and she continued to reply that she was fine" and "did not make any complaints"; and

■ that "Grimaldi did not report to . . . Napolitano that she expected to experience withdrawal symptoms."

(Nigro's Rule 56.1 Statement ¶¶ 41-42, 44, 52, 56.) As to these assertions, Plaintiff stated, "Disputed, there is no reason to accept Napolitano['s] self-serving testimony." (Plaintiff's Rule 56.1 Statement ¶¶ 41-42, 44, 62, 56, in response to Nigro.)

As to interactions between herself and Grimaldi, Nigro, who had been a correction officer at PCCF for more than 10 years (*see*, *e.g.*, Nigro Dep. 14), testified in her deposition that she knew of Grimaldi's prior incarcerations at the PCCF and knew that they were "always . . . for drugs" (*id*. at 27). In her Rule 56.1 Statement-- citing her own deposition testimony--Nigro asserted, *inter alia*,

■ that she "*did not know which drugs were the bases for [Grimaldi's] prior arrests*";

■ that she "*was not aware of Grimaldi's bi-polar disorder diagnosis*";

■ that she "*did not know that Grimaldi had ever attempted to commit suicide in the past*";

- 22 -

■ that "Grimaldi told Corrections Officer Nigro that she was incarcerated at the PCCF on this occasion because of marijuana"; and

■ that "*Grimaldi did not express a concern to Corrections Officer Nigro that she was going to experience withdrawal*."

(Nigro's Rule 56.1 Statement ¶¶ 90-91, 93-94, 101 (emphases added).)  As to each of these assertions, Plaintiff responded, "Disputed, there is no reason to accept Nigro's *self-serving testimony*," or "disputed" as to "Ms. Grimaldi's statement or conclusions about her understanding of the situation."  (Plaintiff's Rule 56.1 Statement ¶¶ 90-91, 93-94, 101, in response to Nigro (emphasis added).)

Defendants also cited Grimaldi's October 28 request for Clonidine as support for their assertions that Grimaldi had said she was fine and not expecting withdrawal.  Nigro asserted that "Grimaldi made a request for a Clonidine prescription *to help with sleep* later that night" (Nigro's Rule 56.1 Statement ¶ 77 (emphasis added)).  The Other Defendants asserted that "Grimaldi requested Clonidine *to help with the withdrawal symptoms she expected to have that night*" (Other Defendants' Rule 56.1 Statement ¶ 74 (emphasis added)).  Both assertions cited the deposition of Nurse Diaz who testified that, at the nursing station on the afternoon of October 28, Grimaldi "did ask if I would get her an order for Clonidine *for later that night*, *if* she needed it." (Diaz Dep. 19 (emphases added).)  Plaintiff neither disputed

that Diaz so testified nor asserted that Grimaldi had not in fact asked for Clonidine; but Plaintiff contended that "there is no reason to accept that [Grimaldi] expected to experience the withdrawal symptoms that night, especially when she was in serious destress [*sic*] only an hour and a half later and then hung herself" (Plaintiff's Rule 56.1 Statement ¶ 74 in response to Other Defendants), that is, "no reason to suspect the [Clonidine] request was for later on that night" (Plaintiff's Rule 56.1 Statement ¶ 77 in response to Nigro).

Plaintiff's principal objections were to defendants' self-serving representations that Grimaldi had said that she was "OK" or "fine," that she had not said anything to the contrary, and that she had indicated that she was not expecting withdrawal symptoms soon. In the depositions of Plaintiff that defendants attached to their summary judgment motions, she had testified that after the suicide attempt the doctors diagnosed Grimaldi as having an "anoxic brain injury," *i.e.*, brain damage due to loss of oxygen; that Grimaldi apparently "[n]ever bec[a]me conscious" (Lara-Grimaldi Dep. 52, 55); and that Plaintiff had been unable "to communicate with [her at] any time" thereafter (Lara-Grimaldi 50-h Deposition 23). Defendants argued that all of their assertions as to behavior and/or statements by Grimaldi should be

deemed undisputed because Plaintiff's challenges were unaccompanied by any citations to evidence.

## 2. *The District Court's Opinion in* Lara-Grimaldi I

In dealing with Plaintiff's claims against Jackson, Napolitano, and Nigro (all claims against other named individual defendants being dismissed), the district court noted that it would "refer[] to Napolitano, Jackson, Nigro, and, where appropriate, Putnam County as 'Defendants,'" Lara-Grimaldi I, 529 F.Supp.3d at 92 n.2, and that

> [t]he Court groups together Napolitano, Jackson, and Nigro for purposes of . . . analysis. While they played different roles, a reasonable jury could find that they knew or should have known of similar facts, including Grimaldi's risk of experiencing withdrawal symptoms, bipolar disorder, and suicide attempt four years prior,

*id*. at 106-07 n.20. We will refer to these three factors as Grimaldi's "vulnerabilities" or "risk indicia."

Noting the need to be alert for circumstantial evidence that could tend to discredit a defendant's self-serving account of his interactions with an alleged victim who had died, *see, e.g., O'Bert v. Vargo*, 331 F.3d at 37, the district court

- 25 -

proceeded to identify evidence contrary to Napolitano's deposition testimony that Grimaldi told him during booking that she was "'not using [heroin] consistently,'" *Lara-Grimaldi I*, 529 F.Supp.3d at 94-95 (quoting Napolitano Dep. 30 (alteration in *Lara-Grimaldi I*)). The court noted that "PCCF records suggest that *Grimaldi reported consistent use to Stewart*," given that Nurse Stewart's notes of his interview with Grimaldi stated "that Grimaldi 'use[d] 2 bundles [of] IV heroin *each day*.'" *Lara-Grimaldi I*, 529 F.Supp.3d at 95 (emphases ours). The court concluded that "[b]ased on this evidence, *a reasonable jury could find that Grimaldi reported to Napolitano that she used heroin consistently, notwithstanding Napolitano's testimony*." *Id*. (emphasis added).

Moreover, the district court stated that although "Napolitano also testified that Grimaldi did not report that she expected withdrawal symptoms," "circumstantial evidence may call into question Napolitano's testimony." *Id*. at 94-95. The court noted that

> [f]irst, *Grimaldi reported to Stewart, the intake nurse, that she expected withdrawal symptoms the following day....* Second, Stewart placed Grimaldi on the Clinical Opiate Withdrawal Scale ("COWS") protocol, . . . which *a reasonable jury could find suggested that withdrawal was expected*. Third, Grimaldi's classification document states "[d]etox" in her medical profile upon admission.... In light of this circumstantial evidence, *a reasonable jury could find that*

*Grimaldi reported to Napolitano that she expected withdrawal symptoms, notwithstanding Napolitano's testimony.*

*Id*. at 95 (emphases added).

In addition to these observations that the record contained evidence creating genuine issues as to whether Grimaldi informed Napolitano during booking (a) that she used a significant amount of heroin daily, and (b) that she expected withdrawal symptoms, the court also noted sufficient evidence to conclude, *inter alia*, that

"[a] reasonable jury could find that Napolitano knew that Grimaldi's prior incarcerations were related to drug possession";

it is "unclear" whether Jackson reviewed Grimaldi's file prior to endorsing Napolitano's recommendation for only routine supervision;

"a reasonable jury could find, *notwithstanding Nigro's* testimony, *that she knew that Grimaldi was a heroin user who had attempted suicide and received a bipolar disorder diagnosis*";

"*[i]ntake documents* also reflect that *Grimaldi made several requests for medicine that a reasonable jury could find were related to withdrawal*";

"a reasonable jury could find *that Defendants knew or should have known that Grimaldi was at risk of withdrawal*";

"[g]iven *Nigro's* prior knowledge of Grimaldi, (Nigro Dep. 26-27), and the fact that PCCF is a 'small jail,' (Colello Dep. 43), *a reasonable jury could conclude that Nigro had seen Grimaldi*

*experiencing withdrawal symptoms or mental health issues at PCCF*";
and

"[b]ased on the [PCCF surveillance] video, a reasonable jury could find that *Nigro inaccurately noted performing a cell check at 3:00 P.M., and inaccurately testified to performing timely checks every thirty minutes*."

*Id*. at 93, 97, 100, 102, 108 (emphases added).

However, other assertions by defendants as to conversations with and observations of Grimaldi were credited by the district court:

Napolitano also testified that Grimaldi told him that "she felt okay" and that "she was not going to hurt herself," . . . that he completed the Screening Guidelines accurately, . . . and that Grimaldi made no complaints while she was being booked . . . . Plaintiff disputes these claims, each time without identifying admissible evidence. . . . The Court is unaware of any evidence on the record that could support a reasonable jury finding the opposite. Indeed, *circumstantial evidence suggests that Grimaldi was not experiencing withdrawal symptoms at the time of her booking*, which is consistent with her statements that she felt okay and did not plan to hurt herself, and with an absence of complaints. . . . ([The] Stewart Notes []not[ed] at booking "no symptoms now" and that Grimaldi denied "unmanageable depression or anxiety"[].) Thus, the Court takes these facts to be undisputed for purposes of the instant Motions.

*Id*. at 95-96 (emphasis added); *see also id*. at 107 ("The undisputed evidence . . . demonstrates that Grimaldi behaved normally, both at intake and on the following day prior to her attempted suicide," given (1) that "Grimaldi at intake said she felt

- 28 -

okay and she was not going to hurt herself," (2) that she "seemed . . . alert at intake," (3) that the "Stewart Notes []not[ed] 'no symptoms now' at booking," and (4) that "Grimaldi appeared normal and was laughing and joking the following day") (citing, *inter alia*, deposition testimony of correction officers defendant Jennifer Wilkinson and defendant Anthony Colello (other internal quotation marks omitted).). The court stated that "[a]bsent impermissible judicial hindsight, such normal behavior does not suggest a risk of suicide." *Id*. at 107 (internal quotation marks omitted).

The court noted that "Napolitano, Jackson, and Nigro all offered testimony suggesting that *they did not believe* Grimaldi was a suicide risk," *id*. at 106 (emphasis added), based in part on their assertions that on October 28, Grimaldi requested Clonidine only as a precaution for a possible withdrawal, and that Grimaldi was not anticipating any withdrawal before later that night. The court described these Rule 56.1 Statement assertions, and its reason for crediting them, as follows:

> During her second visit to the medical unit, Grimaldi requested Clonidine. (Defs.' Statement ¶ 74; Nigro Statement ¶ 77; Pl.'s Statement [pp.] 12-13, 30; Diaz Dep. 19.) Clonidine is a blood pressure medication used to treat withdrawal symptoms. (Nigro Statement ¶ 78; Pl.'s Statement [p.] 30; Diaz Dep. 19.) The Parties dispute the motivation for her request. *Defendants identify testimony that she requested Clonidine for "later that night, if she needed*

*it."* (*Diaz Dep. 19*; *see also* Defs.' Statement ¶ 74.) Plaintiff states that the fact that Grimaldi began to experience acute distress fewer than two hours later suggests that she may have expected withdrawal symptoms sooner than that night. (Pl.'s Statement [pp.] 12-13; *see* Rankin Decl. Ex. 17 ("Loria Statement") (Dkt. No. 136-17).) But Plaintiff introduces *no reason to doubt Diaz's testimony, as she is not named as a Defendant. Contra O'Bert*, 331 F.3d at 37. More importantly, the statement by Grimaldi's cell neighbor Renee [*sic*] Loria ("Loria") is consistent with Diaz's testimony. It suggests that Grimaldi began experiencing withdrawal symptoms at around 2:45 P.M., more than an hour after requesting Clonidine. (*See* Loria Statement.) The statement does not suggest that Loria noticed Grimaldi experiencing withdrawal symptoms when Loria returned to her cell at approximately 2:30 P.M., at which point Grimaldi was already in her cell next door. (*Id.*) And *all available circumstantial evidence suggests that Grimaldi was not experiencing withdrawal symptoms prior to that time.* (*See, e.g.,* Colello Dep. 50 (Grimaldi "appeared normal, she was laughing and joking with the other inmates"); *Nigro Dep. 33 (Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal symptoms).) Thus, the Court accepts as undisputed Diaz's testimony that Grimaldi requested Clonidine for later that night.* (*See* Diaz Dep. 19.)

*Lara-Grimaldi I*, 529 F.Supp.3d at 100-01 (emphases added). The district court also accepted as true Nigro's testimony "that Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal," *id*. at 102. And, as shown by the last half-dozen lines of the prior quote, that testimony from Nigro was a basis for the court's acceptance of the proposition that Grimaldi requested Clonidine only "for later that night."

Citing principles announced in *Farmer v. Brennan*, 511 U.S. 825 (1994),

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir.

2017) ("*Darnell*"), the district court observed that "a pretrial detainee has a Fourteenth

Amendment substantive due process right to care and protection, including

protection from suicide resulting from a preexisting mental health disorder."

*Lara-Grimaldi I*, 529 F.Supp.3d at 105. It noted that a claim for denial of that right may

be established by proof (a) that the deprivation of care was sufficiently serious, and

(b) "that the defendant acted or failed to act with a sufficiently culpable state of mind."

*Id*. at 105 (internal quotation marks omitted). The court noted that in this case, only

the latter was at issue. *See id*. at 105-06.

The district court observed that this Court in *Darnell* held--in light of the

Supreme Court's decision in *Kingsley*--that "deliberate indifference," the state-of-mind

element of such a Fourteenth Amendment claim, "is defined objectively," and that a

plaintiff is not required to show "subjective awareness" by the defendant official "that

[his] acts (or omissions) have subjected the pretrial detainee to a substantial risk of

harm." *Id*. at 105 (internal quotation marks omitted). Rather, "when a claim arises

under the Fourteenth Amendment," the pretrial detainee can establish a culpable state

of mind by proving either "'that the defendant-official acted intentionally' in

- 31 -

depriving adequate medical care '*or recklessly failed to act with reasonable care . . . though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.*'" *Id*. (quoting *Darnell*, 849 F.3d at 35 (emphases ours)). To prove a constitutional claim, "[a] detainee must prove that an official acted intentionally *or* recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36 (emphasis added).

While noting that "a reasonable jury could find that [Jackson, Napolitano, and Nigro] knew or should have known of . . . Grimaldi's risk of experiencing withdrawal symptoms, bipolar disorder, and suicide attempt four years prior," *Lara-Grimaldi I*, 529 F.Supp.3d at 106-07 n.20, the court reasoned that their summary judgment "[m]otions turn[ed] on whether a reasonable jury could find that Defendants should have known of an excessive risk that Grimaldi would attempt suicide," *id*. at 106. The court concluded that "[n]o reasonable jury could so find." *Id*. at 107.

The court stated that, "[a]s discussed, a reasonable jury could find that Defendants knew or should have known that Grimaldi suffered from bipolar disorder and had attempted suicide four years prior," given her "reporting bipolar disorder and prior suicide attempt to Napolitano," and Nigro's recognition that "Grimaldi was 'a troubled girl' who 'always came in for drugs.'"

*Id*. (quoting Nigro Dep. 27 and citing PCCF Suicide Screening form dated October 27, 2015). But the court concluded that "treatment for depression and a single prior suicide attempt some [four] years in the past does not establish a high risk of suicide," *Lara-Grimaldi I*, 529 F.Supp.3d at 107 (internal quotation marks omitted), and it ruled that "no reasonable jury could find that awareness of Grimaldi's bipolar disorder and prior suicide attempt four years earlier would, *without more*, indicate a significant risk of suicide to a reasonable officer," *id*. at 108 (emphasis added).

The court had also noted that "a reasonable jury could find that Defendants knew or should have known that Grimaldi was at risk of withdrawal," because, *inter alia*, Stewart's Notes stated that "Grimaldi expected withdrawal symptoms," his intake notes indicated that Grimaldi was "detoxing upon admission," and Napolitano testified in his deposition that the 20 bags of heroin used by Grimaldi on the day before her booking were a "significant amount." *Id*. (internal quotation marks omitted). However, after exploring decisions in other cases, the court concluded that "no reasonable jury could find that awareness that Grimaldi expected withdrawal symptoms would, *without more*, indicate a significant risk of suicide to a reasonable officer." *Id*. (emphasis added)

The district court concluded that there was no genuine issue to suggest deliberate indifference (a) by Napolitano in recommending Grimaldi for only routine supervision because that conduct was at most negligent, (b) by Jackson in failing to review Grimaldi's file before endorsing Napolitano's recommendation of routine supervision, or (c) by Jackson and Napolitano for "not informing the next shift about Grimaldi's expected withdrawal symptoms" "because it was reasonable for Defendants to find no significant risk of suicide." *Lara-Grimaldi I*, 529 F.Supp.3d at 109. The court stated that "Plaintiff could prove that Defendants departed from PCCF's typical standard of care" by failing to recommend "constant monitoring for an inmate who reported expecting withdrawal symptoms, . . . and failing to perform checks every 30 minutes," but "those failures would support[], at most, a finding of negligence . . . , and it is well established that negligence cannot form the basis of a deliberate indifference claim." *Id*. (internal quotation marks omitted).

The district court thus granted the motions by Jackson, Napolitano, and Nigro for summary judgment dismissing Plaintiff's § 1983 deliberate indifference claims against them.

The Other Defendants' motion for summary judgment had been made on behalf of the County as well as Jackson and Napolitano (and other not-yet-

- 34 -

dismissed individual defendants--other than Nigro); and the district court noted that it was possible that its dismissal of the claims against Jackson, Napolitano, and Nigro might preclude recovery by Plaintiff on her *Monell* claim against the County. However, the court stated that this basis for dismissing the County had not been sufficiently briefed, and it deferred consideration of the motion by the County, pending receipt of further submissions. *See Lara-Grimaldi I*, 529 F.Supp.3d at 110-11.

In addition, the court noted that if it were not to dismiss the *Monell* claim, it might well retain jurisdiction of Plaintiff's state-law claims against Jackson, Napolitano, and Nigro. Accordingly, the court also deferred consideration of the requests of Jackson, Napolitano, and Nigro for summary judgment dismissing the state-law claims against them. *See id*. at 110.

3. *Summary Judgment for the County*: Lara-Grimaldi II

In March 2022, the County renewed its request for summary judgment, based principally on the district court's 2021 ruling in *Lara-Grimaldi I* and the Rule 56.1 Statements that had previously been submitted to the district court by Nigro, the Other Defendants, and Plaintiff for the summary judgment motions filed in March 2020. The County contended (1) that the actions or inactions of the individual

- 35 -

defendants did not constitute deliberate indifference to Grimaldi's health and safety, and (2) that Plaintiff's *Monell* claim of constitutionally defective County policy, custom, or practice was unsupported.

The district court incorporated by reference the findings it had made in *Lara-Grimaldi I*, and it granted the County's motion for summary judgment dismissing the § 1983 claim against it, holding that Plaintiff's *Monell* claim was foreclosed by her failure to establish that County employees violated Grimaldi's constitutional rights. *See Lara-Grimaldi II*, 2022 WL 17541815, at *1, *3-*4.

Having dismissed the only remaining federal claim in the action, the district court declined to exercise supplemental jurisdiction over the state-law claims. *See id*. at *4. The court dismissed those claims--as well as the claims against the John and Jane Doe defendants whom Plaintiff had not identified--without prejudice. *See id*. at *4-*5. A final judgment was entered on December 7, 2022, and this appeal followed.

D. *The Scope of this Appeal*

The scope of this appeal is limited. The notice of appeal stated that Plaintiff appeals from the "Judgment entered on December 7, 2022 (ECF No. 173),

following the District Court's grant of summary judgment in favor of the defendants, the December 6, 2022 Opinion and Order (ECF No. 172)"--*i.e.*, *Lara-Grimaldi II*--"and the March 29, 2021 Opinion and Order (ECF No. 140)," *i.e.*, *Lara-Grimaldi I*. Neither the notice of appeal nor Plaintiff's briefing in this Court mentions any of the district court's other decisions.

In addition, Plaintiff's briefs on appeal do not challenge all of the rulings made *Lara-Grimaldi I*, some of which dismissed, as abandoned, her claims against certain correction officers other than Jackson, Napolitano, and Nigro, *see Lara-Grimaldi I*, 529 F.Supp.3d at 104 n.14. In discussing *Lara-Grimaldi I*, Plaintiff's briefs challenge only the dismissals of her § 1983 claims against Jackson, Napolitano, and Nigro.

And as to the dismissal of her § 1983 claim against the County in *Lara-Grimaldi II*, Plaintiff's briefs on appeal contain no argument at all, other than her contention that Jackson, Napolitano, and Nigro knew or should have known that Grimaldi was a suicide risk. The absence of any request that Plaintiff's § 1983 claim against the County be reinstated is notable throughout her briefs. Her main brief begins by listing the "ISSUES PRESENTED" as

- 37 -

- Whether the district court erred in finding that no reasonable jury could find that *individual defendants* knew or should have known of a substantial risk to Ms. Grimaldi's health or safety?

and

- Whether the district court erred in granting summary judgment given that *individual defendants did nothing* to protect Ms. Grimaldi from suicide?

(Plaintiff's brief on appeal at 3 (emphases added).) The brief's "STATEMENT OF THE CASE," after stating that Plaintiff "brought this case against the Putnam County and its corrections officer" [*sic*], mentions the dismissal of the County only in passing:

> [*o*]*n March 29, 2021, [the district court] granted individual defendant correction officers' motion for summary judgment on the Section 1983 deliberate indifference claims against them. . . . On December 6, 2022, [the district court] granted Putnam County's motion for summary judgment on the Section 1983 Monell claims. . . . Ms. Lara-Grimaldi now appeals the March 29, 2021 opinion and order.*

(*Id.* (emphases added).) And the brief's Conclusion requests only the reversal of *Lara-Grimaldi I*. (*See id*. at 49 ("Ms. Lara-Grimaldi seeks reversal of the district court's *March 29, 2021* opinion and order on the motions for summary judgment" (emphasis added)); *see also* Plaintiff's reply brief on appeal at 24 ("the district court's *March 29, 2021* opinion and order granting summary judgment should be reversed") (emphasis added).)

Accordingly, the issues argued by Plaintiff on this appeal focus solely on the dismissal of Plaintiff's § 1983 deliberate indifference claims against Jackson, Napolitano, and Nigro.

## II. DISCUSSION

On appeal, Plaintiff contends that the district court failed to apply the standards set out in *Darnell* for a pretrial detainee's substantive due process claim under the Fourteenth Amendment; and she argues that it erred in finding that no reasonable jury could find a significant risk that Grimaldi would attempt suicide and that no reasonable jury could find that Jackson, Napolitano, and Nigro knew, or should have known, of that risk. She contends principally that Napolitano and Jackson were deliberately indifferent to that risk by not recommending that Grimaldi be given supervision more frequently than at the routine 30-minute intervals, and that Nigro was deliberately indifferent in providing supervision that was below even the routine level. For the reasons that follow, we affirm the dismissal of Plaintiff's § 1983 claims against Napolitano and Jackson, but vacate the dismissal of her § 1983 claim against Nigro.

A.  *Constitutional Rights of Pretrial Detainees*

The Eighth Amendment of the Constitution prohibits the infliction of "cruel and unusual punishments" on persons convicted of crimes. U.S. Const. amend. VIII.  This proscription is violated by prison officials who--through their actions or failure to act--reveal "'deliberate indifference to serious medical needs of prisoners,'" *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 243-44 (1983) ("*Revere*") (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), or with "deliberate indifference to a substantial risk of serious harm," *Farmer*, 511 U.S. at 828 (internal quotation marks omitted).

> Depending on their severity, psychiatric or psychological conditions can present serious medical needs in light of our contemporary standards. *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  The *serious medical needs standard contemplates a condition of urgency such as one that may produce death*, degeneration, or extreme pain. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). . . .  In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm.  *See Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

*Charles v. Orange County*, 925 F.3d 73, 86 (2d Cir. 2019) ("*Charles*") (emphasis added).

The term "deliberate indifference describes a state of mind more blameworthy than negligence," but it is a standard that "is satisfied by something less

than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835; *see, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996) ("conduct may have been deliberately indifferent if it was reckless though not intentional"). For a prisoner to establish an Eighth Amendment claim of deliberate indifference to his serious medical needs he would have to make "a showing that the official was subjectively aware of the risk." *Farmer*, 511 U.S. at 829.

As "the Eighth Amendment is concerned" with "punishment[]" of "prisoners," which a state cannot mete out "'until after it has secured a formal adjudication of guilt in accordance with due process of law,'" *Revere*, 463 U.S. at 243-44 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 n.40 (1977)), "the relevant constitutional provision" governing a state's responsibility to care for persons in its custody who are not prisoners, such as civil detainees or pretrial detainees, "is not the Eighth Amendment but is, instead, the Due Process Clause of the Fourteenth Amendment," *Revere*, 463 U.S. at 244 (or for federal detainees, the Due Process Clause of the Fifth Amendment, *see, e.g.*, *Darnell*, 849 F.3d at 21 n.3). However, a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Revere*, 463 U.S. at 244.

In *Kingsley*, the Supreme Court considered whether a jury had been instructed correctly as to the showing that a pretrial detainee, who claimed that jail officers had used excessive force against him, was required to make in order to prove that they had been deliberately indifferent to his safety. The defendant officers conceded that they had intended to use the amount of force they used. The trial court instructed the jury in a way that "suggested the jury should weigh [defendants'] *subjective reasons* for using force and [their] *subjective views about the excessiveness* of the force." *Kingsley*, 576 U.S. at 403-04 (emphases added). The jury returned a verdict for the defendants, which the court of appeals affirmed. *See id*. at 394. The Supreme Court vacated the affirmance; it ruled that "a pretrial detainee" need not "show that the officers were *subjectively* aware that their use of force was unreasonable"; rather, he need prove "only that the officers' use of that force was *objectively* unreasonable." *Id*. at 391-92 (emphases in original).

This Court in *Darnell*, shortly after the Supreme Court decided *Kingsley*, considered claims by 20 pretrial detainees alleging that, at a 24-hour holding facility prior to arraignment, they were subjected to appalling conditions of confinement as to, *inter alia*, crowding, sanitation, and vermin infestations, with deliberate indifference to the deprivation of their Fourteenth Amendment due process rights.

The district court had granted summary judgment dismissing the complaint, holding, *inter alia*, that no plaintiff could "establish the subjective prong of a deliberate indifference claim by proving that the individual defendants acted . . . with punitive intent" or "were actually aware of any dangerous conditions." *Darnell*, 849 F.3d at 20-21 (internal quotation marks omitted).

We vacated the judgment, noting that "the Supreme Court's decision in *Kingsley* altered the standard" that our Court had previously used "for deliberate indifference claims under the Due Process Clause," *id*. at 30. We concluded that after *Kingsley*, "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id*. at 35. In sum,

> to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety.

*Id*. (emphasis added).

Even given the objective standard, however, "any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence." *Id*. at 36. "[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 576 U.S. at 396 (internal quotation marks omitted) (emphasis in *Kingsley*).

In *Charles*, the plaintiffs were immigrants, civilly confined for several months, whose serious mental health disorders were treated while they were confined. *See* 925 F.3d at 77. Their § 1983 action alleged that the state failed to provide them, before their release from custody, with mental-health-discharge planning that was "necessary to mitigate the risks of interrupted treatment" when they "transition[ed] from treatment within the institution to other sources of treatment." *Id*. at 80. The district court dismissed their complaint for failure to state a claim, interpreting their claims as asserting that the state should have provided plaintiffs with medical care even after they were discharged from custody. *See id*. at 80-81.

This Court, viewing the factual allegations in the complaint in the light most favorable to the plaintiffs, concluded that the plaintiffs had plausibly alleged that planning for interim medication and referrals was part of the treatment they

- 44 -

should have been provided before they were released. We noted that although *Darnell* involved numerous unhealthy conditions of confinement and "did not specifically address medical treatment," the objective standard announced by *Kingsley*, and discussed and applied in *Darnell*, for assessing deliberate indifference is equally applicable to due process claims for denial of medical care.

> Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege *either* that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health *or* that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.

*Charles*, 925 F.3d at 87 ("knew" and "should have known" emphasized in original; other emphases added).

We vacated and remanded for further proceedings, including discovery, as the plaintiffs had

> plausibly alleged that *Defendants were fully aware of, and violated*, both Orange County and ICE *policies* by failing to provide them with discharge planning as part of their care. Plaintiffs' allegations, if proven true, are sufficient to establish that Defendants knew, or should have known, of the substantial risk that Plaintiffs would relapse and suffer serious adverse health consequences if they were not provided with necessary discharge planning, such that a fact-finder could infer reckless disregard beyond mere negligence or medical malpractice.

*Id*. at 89 (internal quotation marks omitted) (emphases ours).  We also noted that "[w]hether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Id*. at 87.  Whether a defendant "was deliberately indifferent to [an] inmate's serious medical needs" is a question "for [a] jury."  *Id*.

B.  *Summary Judgment Principles*

Principles governing consideration of motions for summary judgment are well established.

> A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c)(2) . . . .  The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 . . . (1986) ("*Liberty Lobby*").

*Porter v. Dartmouth-Hitchcock*, 92 F.4th 129, 147 (2d Cir. 2024) ("*Porter*") (intermediate quotation marks and emphases omitted).

In reviewing the evidence and the inferences that may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"

*Id*. (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255) (intermediate quotation marks and emphases omitted)).

Further, in ruling on such a motion, the district court "may not properly consider the [evidence] in piecemeal fashion." *Porter*, 92 F.4th at 147 (internal quotation marks and emphasis omitted). But while "'the court should review the record as a whole, it *must disregard all evidence favorable to the moving party that the jury is not required to believe*.'" *Id*. (quoting *Reeves*, 530 U.S. at 151 (intermediate quotation marks omitted) (emphasis in *Porter*)).

"We review the district court's grant of summary judgment *de novo*, applying the same standards that govern the district court's consideration of the motion." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see, e.g., Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021).

- 47 -

C. *The Record in the Present Action*

In light of the substantive and procedural principles discussed above, we have several difficulties with the district court's dismissal of Plaintiff's § 1983 claim against Nigro, as well as with parts of its analysis of the record generally. Preliminarily, however, we note that the record contains adequate evidence to warrant the district court's view that "a reasonable jury could find that" Jackson, Napolitano, and Nigro "knew or should have known of" Grimaldi's three relevant risk indicia, *i.e.*, (1) "Grimaldi's risk of experiencing withdrawal symptoms," (2) her "bipolar disorder," and (3) her "suicide attempt four years prior," *Lara-Grimaldi I*, 529 F.Supp.3d at 106-07 n.20. As to Napolitano and Jackson this is, of course, beyond dispute. Napolitano noted Grimaldi's mental condition, her prior suicide attempt, and her drug use ("heroin[,] 2 bundles 10/26/15"), on the October 27 suicide-prevention screening form for Grimaldi that he prepared (PCCF Suicide Screening form dated October 27, 2015); and Jackson reviewed that intake paperwork (*see* (Deposition of Karen Jackson ("Jackson Dep.") 38-42). These three vulnerabilities were also well documented in records (which Napolitano reviewed (*see* Napolitano Dep. 35-36)) of Grimaldi's four prior detentions at PCCF--her drug use being noted on all four screening forms, mental health issues also being noted on all four, and her past

- 48 -

suicide attempt being noted on three. And the October 27 notes of Nurse Stewart, whose assessment was required for intake, stated that Grimaldi "[h]as withdrawn from heroin in past here."

The district court's view that a reasonable jury could also find that Nigro knew Grimaldi had these vulnerabilities is supported by its observations that PCCF was a "'small jail,'" *Lara-Grimaldi I*, 529 F.Supp.3d at 93, 100, 107, 108 (quoting Colello Dep. 43); *see also* Diaz Dep. 57 ("small jail"); the fact that this was Grimaldi's fifth confinement at PCCF in 3¼ years; the acknowledgement that at least eight officers at PCCF--including Nigro--"knew Grimaldi from her prior incarcerations at PCCF" (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶¶ 26, 34, 48, 61, 70, 79, 86, 97); and the fact Nigro testified that she had viewed Grimaldi as "a troubled girl," "'[c]ause she always came in for drugs" (Nigro Dep. 27).

Thus, although the district court's analysis of the ultimate merit of Plaintiff's § 1983 claims against Jackson, Napolitano, and Nigro was inappropriately conflated (*see* Subparts 1 and 2 below), the court correctly viewed the record as sufficient to permit a reasonable jury to find that these three individuals knew of all three of Grimaldi's vulnerabilities. Further, it was appropriate for the court to consider the existence of that knowledge, since, as discussed above, the objective

- 49 -

standard for deliberate indifference is what an official "*knew or* should have known";

and Jackson, Napolitano, and Nigro could thus be found deliberately indifferent if

they had actual knowledge that their action (or forbearance from action) was likely

needed in order to avoid a Grimaldi suicide attempt.

However, the "or should have known" prong of the objective standard

for assessing deliberate indifference means that an officer's *lack* of actual knowledge

is not to be considered.  The district court here, in concluding that no reasonable juror

could find Jackson, Napolitano, or Nigro to have been deliberately indifferent to the

risk of a Grimaldi suicide attempt, appeared to find relevant the descriptions by these

defendants as to their lack of knowledge or lack of belief in any such risk.  The court

noted testimony by "Napolitano, Jackson, and Nigro . . . suggesting that they *did not*

*believe* Grimaldi was a suicide risk"; that "Jackson *at no point thought* Grimaldi needed

more than routine supervision;" and that "Nigro '*never knew* that [Grimaldi's suicide

attempt] could happen.'" *Lara-Grimaldi I*, 529 F.Supp.3d at 106 (quoting Nigro Dep.

38) (all emphases ours)).  In *Kingsley*, the Supreme Court viewed instructions

containing such references to the defendant officers' state of mind as erroneous

because "the jury was instructed to consider . . . [w]hether [respondents] reasonably

believed there was a threat," which helped to "suggest[ that] the jury should weigh

- 50 -

respondents' subjective reasons . . . and subjective views about" their conduct. 576 U.S. at 403-04 (internal quotation marks omitted). As "that was error" as a jury instruction for determinations of fact, *id*. at 404, even less is it appropriate as an element in the court's consideration of whether to grant judgment for the defendants as a matter of law.

In addition, the district court's opinion in *Lara-Grimaldi I* contains indications that the court did not consider the record as a whole in its assessment of whether Grimaldi's vulnerabilities could be found to create a significant risk that she would attempt suicide. For example, the court stated that "treatment for depression and a single prior suicide attempt some [four] years in the past does not establish a high risk of suicide," *Lara-Grimaldi I*, 529 F.Supp.3d at 107 (internal quotation marks omitted), and it concluded that "no reasonable jury could find that awareness of Grimaldi's bipolar disorder and prior suicide attempt four years earlier would, *without more*, indicate a significant risk of suicide to a reasonable officer," *id*. at 108 (emphasis added). That assessment considered two of Grimaldi's vulnerabilities--her mental health issues and her prior suicide attempt--"without" consideration of the likely onset of withdrawal from her recent injection of 20 bags of heroin.

The district court of course did not ignore the fact that Grimaldi would likely experience withdrawal symptoms from that "significant amount" (Napolitano Dep. 30) of heroin. But it appears to have considered the likelihood-of-withdrawal problem also in isolation. It found that "no reasonable jury could find that awareness that Grimaldi expected withdrawal symptoms would, *without more*, indicate a significant risk of suicide to a reasonable officer." *Lara-Grimaldi I*, 529 F.Supp.3d at 108 (emphasis added).

While the court's opinion proceeds to refer to putting factors "together," that does not appear to have meant that the court assessed the risk posed by Grimaldi's three vulnerabilities as a whole. (*See also* Part II.C.2. below.) It said, "[i]n putting together these factors, the Court finds instructive *Silvera v. Department of Corrections*, No. 09-CV-1398, 2012 WL 877219 (D. Conn. Mar. 14, 2012)." *Lara-Grimaldi I*, 529 F.Supp.3d at 108. But *Silvera* was a case without the factor of impending withdrawal. The decedent there drank only "a little bit" and "did not use drugs." *Silvera*, 2012 WL 877219, at *4.

We also note that the district court in certain respects did not view the record in the light most favorable to Plaintiff. One of the most important of these was the court's finding that "*all available circumstantial evidence* suggests that *Grimaldi was*

- 52 -

*not experiencing withdrawal symptoms prior to*" 2:30 p.m. on October 28. *Lara-Grimaldi I,* 529 F.Supp.3d at 101 (emphases added). However, several aspects of the record are expressly, or may permissibly be interpreted as, contrary to this finding.

First, while the court quoted Stewart's observation that Grimaldi has "'no symptoms *now,*'" *id*. at 96, 99, 107 (quoting the Notes (emphasis ours)), the more complete comment was "has no symptoms now, but expects them tomorrow," and none of that language implies that Grimaldi had not experienced withdrawal symptoms earlier that day. She was being interviewed by Nurse Stewart late at night on October 27, after she had been through the booking process with Napolitano. The Notes stated that Grimaldi "does request Gatorade as she suffers dehydration during withdrawal," which might suggest that she had already experienced withdrawal symptoms that day and was experiencing lingering hydration, or that she expected to experience withdrawal symptoms early the next day. Moreover, in the Notes, while Stewart agreed with the Napolitano-Jackson recommendation for "routine supervision" of Grimaldi--*i.e.,* checks every 30 minutes--he stated that that level of supervision "may need to be revisited if symptoms of withdrawal *reemerge*" (Stewart Notes (emphasis added)). The reference to the possibility of withdrawal symptoms

"*re*emerg[ing]" suggests that Stewart was aware that Grimaldi had already experienced some withdrawal symptoms, even if she had "no symptoms *now*."

Second, before 2:30 p.m. on October 28, Grimaldi had had two COWS evaluations to measure various symptoms of drug withdrawal. Her score on the second was higher than her score on the first; but on both, her symptoms were deemed "mild." (Plaintiff's and Nigro's Rule 56.1 Statements ¶¶ 71, 74-75; *see* Nigro brief on appeal at 4 ("around 10:00 am, Appellee Nigro took Grimaldi for a second opiate withdrawal evaluation . . . . Grimaldi was assessed at a level of '7,' which was still in the mild withdrawal range.").) "Mild" is inconsistent with the court's finding of no symptoms at all, *see Lara-Grimaldi I*, 529 F.Supp.3d at 101.

Finally, the district court's finding of no evidence that Grimaldi had any withdrawal symptoms prior to 2:30 p.m. on October 28 is squarely contrary to the Diaz deposition's Exhibit 1--which the parties do not appear to have called to the court's attention--the written statement that Nurse Diaz prepared within an hour after the discovery of Grimaldi's suicide attempt (*see* Diaz Dep. 57-60). Diaz was at the nursing station during Grimaldi's second COWS evaluation on October 28 at 10 a.m. (*see* Diaz Dep. 16-17), and her written statement says that "[a]t that time [Grimaldi] complained about mild withdrawal symptoms" (Diaz Dep. Exhibit 1).

In sum, the Stewart Notes, the COWS evaluations, and the Diaz written statement are contrary to the district court's finding that there is no evidence that Grimaldi had experienced any withdrawal symptoms before her last interaction with Nigro, which occurred no later than 2:30 p.m.

Analytically, we also disagree with the district court's treatment of Jackson, Napolitano, and Nigro as a group with respect to Plaintiff's claim of deliberate indifference. Although they were the correction officers who were most closely involved with Grimaldi on October 27 and 28, and they all had knowledge of Grimaldi's vulnerabilities, the interactions of Jackson and Napolitano with Grimaldi did not overlap temporally with Nigro's, and their responsibilities differed from Nigro's.

1. *Jackson and Napolitano*

As described in Part I.A.1. above, Napolitano and Jackson had their respective interactions with Grimaldi on October 27 only as booking officer and supervising sergeant. There is no evidence that they had any contact with or responsibility for her on October 28. Plaintiff's § 1983 claims against Napolitano and Jackson were (a) that they should have placed Grimaldi under constant surveillance,

or at least on a 15-minute watch, and that it was reckless of them to recommend merely routine supervision; and (b) that they failed to brief the PCCF personnel on following shifts as to the risk of a Grimaldi suicide attempt. The record supports the district court's conclusions that Plaintiff did not point to evidence from which a rational juror could find deliberate indifference on the part of Napolitano or Jackson.

The record of Grimaldi's intake--which took place only after Napolitano required that she be taken for medical care for a laceration of her knee--showed, *inter alia*, that Grimaldi's answers to PCCF's suicide-prevention-screening-form questions were similar to the answers shown in the record of her four prior detentions at PCCF. Napolitano had consulted those PCCF files to compare them with her answers to his questions on October 27. As described in greater detail in Part I.A.1. above, those four prior screenings showed that in 2012-2014 Grimaldi had never been recommended for constant surveillance. All four noted that she had a history of mental health counseling or treatment and a history of drug abuse. Three of those records also noted that she had a prior suicide attempt; and on those three, the recommendation was for 15-minute watch. Only the 2013 form failed to note Grimaldi's prior attempt at suicide, and the recommendation at that time was for routine watch.

The record shows similar answers by Grimaldi to Napolitano's questions on October 27, *i.e.*, that she was bipolar, had made a prior suicide attempt, and had injected a substantial quantity of heroin on October 26, and that she was not "thinking about killing [her]self" and was not "expressing feelings of hopelessness." Nurse Stewart asked Grimaldi similar questions and received similar answers, showing "no evidence of suicidal . . . ideation, plan, or intent."

Napolitano read Grimaldi's past booking records and concluded that they showed conditions and circumstances consistent with those evinced in her answers to his questions on October 27, and he recommended that she have routine supervision. There is some question as to whether Jackson reviewed those records before endorsing that recommendation, *see, e.g., Lara-Grimaldi I*, 529 F.Supp.3d at 96-97; but the records simply showed information consistent with Grimaldi's current answers as reported. Although 15-minute supervision had been recommended for past detentions when Grimaldi's prior suicide attempt had been noted, she had no record of any prior suicide attempt at PCCF, whether being on 15-minute supervision or routine supervision.

While Plaintiff declined to admit the truth of defendants' Rule 56.1 Statement assertions that Grimaldi had given the answers indicated on the October

27, 2015 booking records compiled by Napolitano or the Notes of the medical interview conducted by Stewart, she was unable to cite any evidence to show that Grimaldi had not given those answers or made the statements as defendants asserted. Some of defendants' assertions may properly be viewed as self-serving, but that attribute did not make them untrue. And if Plaintiff's claims were to be tried on such a record, with these defendants so testifying as to Grimaldi's statements, appearance, and non-statements, Plaintiff could not carry her burden of establishing that Grimaldi had a different appearance or made different statements merely by urging the jury to disbelieve defendants' evidence. *See generally Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.").

Given Plaintiff's inability to point to any evidence as to Grimaldi's appearance, statements, non-statements, and frame of mind at the time of her intake proceedings, the district court properly accepted the Other Defendants' Rule 56.1 Statement assertions about Grimaldi at her booking as undisputed. And it properly concluded that in those circumstances, Plaintiff did not show a genuine issue to be tried on her claims that Napolitano and Jackson were deliberately indifferent to a

substantial risk of a Grimaldi suicide attempt, in recommending that Grimaldi be given routine supervision.

Plaintiff's additional contention was that Napolitano and Jackson were culpably reckless in failing to warn PCCF staff on the shifts that followed them of the risk that Grimaldi might attempt suicide. Napolitano did not report his observations of Grimaldi or her responses to the screening questions to the correction officer who replaced him at the end of his shift as booking officer. (Plaintiff's and Other Defendants' Rule 56.1 Statements ¶¶ 57, 63.) And Jackson did not recall giving any special instructions regarding Grimaldi to the sergeant who replaced her at the end of her shift. (*See* Jackson Dep. 46.)

The performance of Napolitano and Jackson in this regard is more troubling, not only because of their knowledge of Grimaldi's risk indicia, but also because Nurse Stewart's concurrence in their recommendation for routine supervision was cabined by his express warning of the need for watchfulness. The Notes said: "With concurrence between screening officer, corrections supervisor, & this RN, routine supervision instituted, *[with] understanding this issue may need to be revisited if symptoms of withdrawal reemerge*." (Emphasis added.)

The district court ruled that "because it was reasonable for Defendants to find no significant risk of suicide, Jackson and Napolitano did not violate the Constitution by not informing the next shift about Grimaldi's expected withdrawal symptoms." *Lara-Grimaldi I*, 529 F.Supp.3d at 109. To the extent that this statement would imply that it was reasonable for Jackson and Napolitano not to inform the next PCCF shift about Grimaldi's expected withdrawal symptoms, we would disagree.

While it may well have been objectively reasonable to believe that Grimaldi did not have withdrawal symptoms at the time of booking, the very concept of "risk" focuses on the possibility of adverse occurrences in the future. And especially given Nurse Stewart's express caveat that supervision of Grimaldi at the routine level "may need to be revisited if symptoms of withdrawal reemerge," it is difficult to comprehend how it would be reasonable for Napolitano and Jackson not to warn their successor custodians to be alert for such a reemergence of withdrawal symptoms. And indeed, it seems clear that some relevant information was passed on, since Nigro, on the next shift, took Grimaldi to the nursing station at 10 a.m. for her second COWS evaluation.

Nonetheless, whether or not actions or inactions by Napolitano and/or Jackson could be found to have been negligent, we conclude that the paucity of

warnings to the following shift was not a flaw of constitutional dimension. That is--given that Grimaldi's answers during the screening process were the same as in her prior screenings, and given that she did not attempt suicide during any of her prior periods of incarceration at PCCF--we cannot conclude that the record supports an inference that the failure to warn future shifts constituted a reckless failure to mitigate a risk to Grimaldi of which they knew or should have known. We therefore affirm the grant of summary judgment dismissing Plaintiff's § 1983 deliberate indifference claims against Napolitano and Jackson.

2. *Nigro*

As discussed in Part I.A.2. above, Nigro's responsibilities with respect to Grimaldi began on the morning of October 28. The principal aspects of the record on which the district court appears to have relied in granting summary judgment in favor of Nigro are (a) Nurse Diaz's testimony that at around 1:00 p.m. on October 28, Grimaldi requested Clonidine, for later that night if she needed it, *see Lara-Grimaldi I*, 529 F.Supp.3d at 100-01; and (b) Nigro's testimony that "Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal symptoms," *id*. at 101. The district court credited both of these representations--and accepted the

defense arguments that they proved that Grimaldi, prior to 2:30 p.m. on October 28, had not had any withdrawal symptoms and did not expect to have any before nighttime--in concluding that Nigro was entitled to summary judgment. We find that the record raises serious questions as to both (a) whether Diaz's testimony could support an inference as a matter of law that Grimaldi did not expect withdrawal symptoms before nighttime, and (b) whether Nigro's assertion that on October 28 "Grimaldi did not express a concern to Corrections Officer Nigro that she was going to experience withdrawal" could properly be deemed credible as a matter of law.

As to the former, the only evidence in the record suggesting that Grimaldi's request for Clonidine on October 28 indicated that she did not expect to need it until later that night came from Diaz. There are flaws in the court's acceptance of Diaz's testimony for that proposition. First, the court stated that it saw "no reason to doubt Diaz's testimony, as she is *not named as a Defendant*." *Id*. at 101 (emphasis added). This was not an accurate reference to summary judgment principles. As indicated in Part II.B. above, the proper focus is not just on statements by the moving parties; rather the court in considering a motion for summary judgment "must disregard *all evidence favorable* to the moving party that the jury is not required to

- 62 -

believe." *Porter*, 92 F.4th at 147 (emphasis in *Porter* (internal quotation marks and other emphasis omitted)).

Second, the court's acceptance of Diaz's implication that Grimaldi did not expect withdrawal symptoms until nighttime relied in part on its flawed view (discussed above) that there was no circumstantial evidence that Grimaldi experienced any withdrawal symptoms before 2:30 that afternoon. *See*, *e.g.*, *Lara-Grimaldi I*, 529 F.Supp.3d at 101. But, as described above, the record contains evidence of the actual arrival of withdrawal symptoms for Grimaldi before 2:30 p.m. on October 28 by reason of, *inter alia*, her COWS evaluations for opiate withdrawal symptoms on October 27 and at 10:00 a.m. on October 28, both of which showed she had mild withdrawal symptoms, and the Stewart Notes cautioning on October 27 that Grimaldi's withdrawal symptoms could "*re*emerge."

Third, the most direct evidence that Grimaldi in fact experienced withdrawal symptoms before 2:30 p.m. on October 28 came from Diaz herself. Diaz stated in her written statement that she heard Grimaldi complain of such symptoms at the nursing station on October 28 at 10 a.m. Although that written statement included that Grimaldi had "requested Clonidine for help with withdrawal symptoms at night," its first two sentences were:

*Inmate Grimaldi was seen in medical around 10 am* by Blythe Goodwin for COW protocol evaluation. *At that time inmate complained about mild withdrawal symptoms.*

(Diaz Dep. Exhibit 1 (emphases added).)

At her deposition Diaz was asked to describe all of her encounters with Grimaldi on October 28; her answer alluded to the morning meeting without mentioning Grimaldi's complaint (*see* Diaz Dep. 17), and she was not asked further questions about that morning. But when she was asked whether "everything in" Exhibit 1 was "accurate as to what . . . occurred that day," she responded, "Absolutely." (*Id*. at 60.)

Diaz's "[a]bsolutely" "accurate" statement that Grimaldi was complaining of withdrawal symptoms on the morning of October 28 should have prevented the district court from concluding that there was no evidence that she had experienced withdrawal symptoms before her last interaction with Nigro at 2:30 that afternoon-- and from concluding as a matter of law that Grimaldi expected no withdrawal symptoms before later that night.

As to Nigro's own deposition testimony, her suggestion that she had no hint that Grimaldi might be experiencing any withdrawal symptoms on October 28 could easily be found not credible by a rational juror. The district court itself found

- 64 -

that at least three highly relevant Nigro assertions in her deposition testimony could be so rejected. Nigro denied knowledge of most of Grimaldi's risk indicia (*see, e.g.,* Nigro Dep. 28 (testified that she did not "ever know that Ms. Grimaldi struggled with addiction issues"); *id*. at 27-28 (testified that she had never witnessed Grimaldi having withdrawal symptoms at PCCF); *id*. at 28 (testified that she did not "know that Ms. Grimaldi had a bi-polar disorder diagnosis"); *id*. (testified that she did not "know that Ms. Grimaldi had previously attempted suicide")). But the district court found that "a reasonable jury could find . . . that [Nigro] knew" that Grimaldi had "*received a bipolar diagnosis,*" that on prior occasions "*Nigro had seen Grimaldi experiencing withdrawal symptoms or mental health issues at PCCF,*" and "*that she knew that Grimaldi was a heroin user who had attempted suicide.*" *Lara-Grimaldi I,* 529 F.Supp.3d at 100 (emphases added). In sum, the court found that "a reasonable jury could find that [Nigro] *knew or should have known of*" all three of Grimaldi's vulnerabilities, *i.e.,* her "*risk of experiencing withdrawal symptoms, bipolar disorder, and suicide attempt four years prior,*" *id*. at 106-07 n.20 (emphases added).

The court credited, however, Nigro's testimony that Grimaldi did not express a concern to her that she was going to experience withdrawal. *See id*. at 101-02 (citing Nigro's Rule 56.1 Statement ¶ 101 and Nigro Dep. 33). It apparently

- 65 -

found Nigro's statement indisputable, stating that Plaintiff "d[id] not identify admissible evidence to support the contrary assertion," and that her objection to the assertions as to "Grimaldi's statement[s] or conclusions" did "not suggest a factual dispute, *because Nigro testified to the absence of any statement from Grimaldi,*" *Lara-Grimaldi I*, 529 F.Supp.3d at 102 (emphasis added).

We do not disagree with the district court's interpretation of Nigro's "did not express a concern" language to mean that Grimaldi did not make a statement; but even if that sentence of Nigro's testimony is true, it cannot properly be considered in isolation. It must be viewed in light of the evidence (a) that Nurse Stewart had cautioned that PCCF staff must be careful about Grimaldi's supervision level because she expected withdrawal symptoms on October 28; (b) that it is the job of the correction officer in charge of a PCCF housing section to check on and "[c]are" for the inmates, to "make sure they're okay" (Nigro Dep. 17), and that that was Nigro's responsibility from 7:30 a.m. to 3:30 p.m. on October 28; (c) that on that morning Nigro took Grimaldi to the nursing station precisely because Grimaldi was scheduled for a COWS evaluation for her opiate withdrawal symptoms; (d) that the COWS measurement that morning showed that Grimaldi's withdrawal symptoms, although still mild, were worse than they had been the night before; and (e) that "[a]t that

[morning session,] [Grimaldi] complained about mild withdrawal symptoms" (Diaz Dep. Exhibit 1). Even if in voicing that complaint Grimaldi was not speaking directly to Nigro, she was not speaking quietly or privately; Nurse Diaz heard Grimaldi's complaint, and she was not the nurse who was conducting the COWS evaluation (*see* Diaz Dep. 16-17).

Moreover, at around 1:00 that afternoon, Nigro took Grimaldi for an unscheduled visit to the nursing station, and Grimaldi asked to receive a prescription for Clonidine. Contrary to the district court's acceptance of Nigro's assertion that "Grimaldi did not on October 28, 2015 express a concern that she was going to experience withdrawal," *Lara-Grimaldi I*, 529 F.Supp.3d at 101, Nigro and the other defendants themselves, regardless of their arguments as to Grimaldi's expectation as to timing, clearly recognize her request for Clonidine as one for medicine to cope with withdrawal symptoms.

All of these were circumstances that Nigro, responsible for Grimaldi's care, knew or should have known.

Further, if the district court has correctly interpreted Nigro's testimony that Grimaldi "did not . . . express a concern [to Nigro] that she was going to experience withdrawal," *id*., as representing that Grimaldi did not make "any

- 67 -

statement," *id*. at 102, we think a rational juror could also infer that Nigro in fact never asked Grimaldi about her withdrawal expectations or about how she felt. If in fact Nigro had asked that question, and Grimaldi had either said she did not expect such symptoms or had refused to answer, surely Nigro would have revealed such a response at her deposition or in a sworn declaration.

But there is no such declaration and no statement by Nigro at her deposition that she asked Grimaldi on October 28 whether she was expecting withdrawal symptoms, or how she felt. We have seen in the record only two items to suggest that Nigro asked Grimaldi those questions on October 28. One is a written statement by PCCF staff social worker Tina Privitera, memorializing a conversation she had with Nigro when she and Nigro (and others) responded to the shouted discovery of Grimaldi hanging at 3:18 p.m. Privitera wrote that "Nigro reported she stated she was apparently 'fine' when *checked on a few min. earlier*." (Memorandum of Tina Privitera dated "10/28/15" "approx 3:20" (emphasis added).) The other suggestion that Nigro asked Grimaldi such a question is found in the Nigro Memorandum of October 28 to the Sheriff following Grimaldi's suicide attempt. In that memorandum, Nigro seems to imply, in writing that she had performed the "routine check" on Grimaldi at 2:55 that afternoon, that she asked Grimaldi how she

felt. But the PCCF surveillance video belies Nigro's statements to both Privitera and the Sheriff because it shows that Nigro was not in the area of Grimaldi's cell at any time after 2:40. The video thus led the Sheriff, in his deposition, to testify that "between the time that Ms. Nigro was last in the South Housing Unit and the time that Officer Cassidy found Ms. Grimaldi" "approximately forty minutes passed" (Sheriff Smith Dep. at 148-49), and to conclude that Nigro's claims of appropriate supervision of Grimaldi were "false" (*id*. at 147-48). In sum, Nigro's only statements in the record that would seem to indicate that she ever asked Grimaldi about her condition and withdrawal expectations on October 28 could not, on a motion for summary judgment, be credited.

Indeed, given the video evidence, a rational juror would be justified in finding that Nigro made at least three false representations on October 28 that she had performed the required routine check on Grimaldi after 2:30 that day, because in addition to her conversation with Privitera and her memorandum to the Sheriff, Nigro listed in the PCCF cell log book a routine check on Grimaldi at "1500," *i.e.*, 3:00 p.m. And in spite of the video evidence to the contrary, Nigro repeatedly testified at her deposition that she had timely checked Grimaldi's cell on October 28 at, or just

before, 3:00 p.m. (*See, e.g.*, Nigro Dep. 33, 50-51; *id*. at 77 ("I didn't go forty minutes between my checks.").)

In sum, a rational juror could find that Nigro testified falsely at her deposition in (a) denying her knowledge of any of Grimaldi's three risk indicia, and (b) insisting that she had performed the required routine care check on Grimaldi on the afternoon of October 28. And it could find that she falsely indicated to others that she had asked Grimaldi about her condition and expectations when in fact she had not.

With the record viewed as a whole, and with permissible inferences drawn in favor of Plaintiff, a rational juror--finding that Nigro had falsely denied having knowledge of Grimaldi's three risk indicia, had falsely stated to a coworker and the Sheriff that she had asked Grimaldi about her expectation of withdrawal symptoms, and had falsely claimed orally, and in writing, and under oath at her deposition that she had performed the required routine check--could find (a) that Nigro either knew or should have known that Grimaldi was expecting withdrawal symptoms, and (b) that, by not performing the required routine check, Nigro deliberately disregarded a significant risk that Grimaldi might attempt to commit suicide.

We conclude that the district court's grant of summary judgment dismissing Plaintiff's § 1983 deliberate indifference claim against Nigro was error.

F. *State-Law Claims*

Plaintiff's state-law claims against Jackson, Napolitano, Nigro, and the County alleged negligence, wrongful death, respondeat superior, and a violation of Article I § 6 of the New York State Constitution. The district court declined to exercise supplemental jurisdiction over these claims because it had dismissed all of Plaintiff's federal claims; it therefore dismissed the state-law claims without prejudice. *See Lara-Grimaldi II*, 2022 WL 17541815, at *4. Because, as discussed above, we vacate the dismissal of the § 1983 claim against Nigro, Plaintiff has a surviving federal claim. We, therefore, vacate the district court's dismissal of the state-law claims against Nigro, Napolitano, Jackson, and the County. *See, e.g.*, *Vengalattore v. Cornell University*, 36 F.4th 87, 112 (2d Cir. 2022).

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on appeal and, except as discussed above, have found them to be without merit. We vacate so much of the judgment as dismissed Plaintiff's § 1983 deliberate indifference claim against Nigro, and as declined to exercise supplemental jurisdiction over Plaintiff's state-law claims against Nigro, Jackson, Napolitano, and the County; and we remand for further proceedings with respect to those claims. The remainder of the judgment is affirmed.

Each side shall bear its own costs of this appeal.